**IN the INTEREST OF A.K., a Child**

No. 04–15–00589–CV

Court of Appeals of Texas, San Antonio.

Delivered and Filed: February 17, 2016

Michael C. Shulman, Michael Shulman-Attorney at Law, San Marcos, TX, Appellant Attorney.

Brenda Kinsler, Texas Department of Family and Protective Services, James Matthews, Austin, TX, Ann Smith, Law Office of Ann Marie Smith, San Antonio, TX, Appellee Attorney.

Sitting: Sandee Bryan Marion, Chief Justice, Marialyn Barnard, Justice, Jason Pulliam, Justice

## OPINION

Opinion by: Marialyn Barnard, Justice

Appellant father ("Father") appeals the trial court's order terminating his parental rights to his child, A.K.[1] Father challenges: (1) the "aggravated circumstances" findings in the temporary orders; and (2) the sufficiency of the evidence to support the trial court's finding that termination was in the best interest of the child. We affirm the trial court's termination order.[2]

### BACKGROUND

In August 2014, the Texas Department of Family and Protective Services ("the Department") received information that two-year-old A.K. was being physically abused. A.K. had been in the care of Father since she was ten-months-old, but Father's girlfriend, "Ronda," was A.K.'s

---

1. In accordance with Rule 9.8 of the Texas Rules of Appellate Procedure, we will refer to the child and relevant adults by their initials or by an alias in order to protect the identity of the minor child. *See* TEX. R. APP. P. 9.8.

2. A.K.'s mother filed an affidavit of relinquishment. She has not appealed the termination order.

primary caretaker.[3] Father acknowledged the child had bruises and other injuries, but claimed they were self-inflicted during "tantrums" or were the result of "accidents." The Department submitted photographs of the child to the Center for Miracles for a consultation and continued its investigation.

In November 2014, approximately three months after the Department's initial visit, and after months of concern over hygiene, injuries, and changes in behavior, "Julia," A.K.'s paternal great—aunt, took A.K. to the hospital. After examining A.K., the hospital contacted the Department based on a suspicion of physical abuse. The documented injuries included bruises, scratches, and bald spots on the child's head. Law enforcement was also contacted and an investigator from the Guadalupe County Sheriffs Office, Robert Murphy, came to the hospital and began an investigation. Ultimately, Investigator Murphy arrested Father and Ronda for the offense of injury to a child.

In early December 2014, the Department filed its original petition seeking removal and termination. The trial court granted the Department emergency custody of A.K. After a hearing, the Department was appointed temporary managing conservator of the child. At a subsequent hearing before an associate judge, the associate judge made a finding of "aggravated circumstances" as to Father pursuant to section 262.2015 of the Texas Family Code ("the Code"). The finding permitted the trial court to waive the requirements of a service plan and reasonable efforts to return the child to the parent. TEX. FAM. CODE ANN. § 262.2015(a) (West Supp.2015). It also permitted the trial court to accelerate the date of the final hearing. *Id.* The associate judge's finding was confirmed by the trial court after Father filed for and obtained de novo review.

Trial was held before the associate judge in April 2015. The associate judge rendered an order terminating Father's parental rights. The associate judge determined Father: (1) knowingly placed A.K. or allowed her to remain in conditions or surroundings that endangered A.K.'s physical or emotional well-being; and (2) engaged in conduct or knowingly placed A.K. with someone who engaged in conduct that endangered A.K.'s physical or emotional well-being. *See id.* § 161.001(b)(1)(D), (E). The associate judge also found termination of Father's parental rights would be in A.K.'s best interest. *See id.* § 161.001(b)(2). Thereafter, Father requested and obtained de novo review in the district court. *See id.* § 201.015. The trial court rendered an order finding termination would be in A.K.'s best interest and terminated Father's parental rights on the same grounds found by the associate judge. Thereafter, Father perfected this appeal.

## ANALYSIS

On appeal, Father does not challenge the evidence with regard to the trial court's findings under section 161.001(b)(1) of the Texas Family Code ("the Code"). Rather, Father raises three issues in which he contends: (1) the aggravated circumstances findings were improper because they were based on a preponderance of the evidence as opposed to clear and convincing evidence; (2) the aggravated circumstances findings deprived Father of due process because they deprived Father

---

3. Ronda has two other children from a previous relationship—girls, ages two and three. According to the evidence, they live half of the time with their father and were not present at the time of the Department's initial home visit. The girls were seen by another Department investigator, but did not show signs of abuse.

of a service plan, possible reunification, and resulted in an expedited trial; and (3) the evidence is legally and factually insufficient to support the trial court's finding that termination was in the best interest of the child.

### AGGRAVATED CIRCUMSTANCES

In his first two issues, Father complains about the aggravated circumstances finding made by the associate judge in a temporary order, which was confirmed by the trial court in a separate temporary order after Father requested de novo review of the finding. On appeal, Father argues the findings are improper because (1) they were based on a preponderance of the evidence as opposed to clear and convincing evidence, and (2) the events resulting from the findings—waiver of service plan, waiver of requirement to make reasonable efforts to return the child to Father, and expedited trial date—violated his right to due process.

Under section 262.2015 of the Code, a trial court may waive the requirements of a service plan and reasonable reunification efforts and may accelerate the trial schedule if it finds that a parent has subjected the child to "aggravated circumstances." *Id.* § 262.2015(a). There are numerous bases upon which a trial court may find aggravated circumstances, including a finding that the child of the parent is a victim of serious bodily injury inflicted by the parent or by another person with the parent's consent, or the parent has engaged in conduct against the child that would constitute a violation of section 22.04 of the Texas Penal Code, i.e., injury to a child, the offense for which Investigator

Murphy arrested both Father and Ronda.[4] *Id.* § 262.2015(b)(2), (3)(H). The associate judge and the trial court found aggravated circumstances existed—as set out in the temporary orders—based on Father's engagement in conduct that would constitute an offense under section 22.04 of the Penal Code.

█ It is undisputed that the aggravated circumstances finding was included only in the *temporary orders* rendered prior to the final order of termination. As this court and others have held, a temporary order is superseded by entry of a final order of termination, rendering moot any complaint about the temporary order. *E.g., In re J.D.S.,* No. 10–15–00217–CV, —— S.W.3d ——, ——, 2015 WL 6437722, at *2 (Tex.App.—Waco Oct. 22, 2015, no pet.) (mem.op.) (holding temporary order for removal of child is superseded by entry of final order of termination); *In re Z.R.M.,* No. 04–14–00063–CV, 2015 WL 4116049, at *5–6 n. 5 (Tex.App.—San Antonio July 8, 2015, no pet.) (mem.op.) (holding that to extent mother raised complaints about child's initial emergency removal, complaints were not proper in context of appeal from final termination order); *M.Z. v. Tex. Dep't of Family & Protective Servs.,* No. 03–13–00858–CV, 2014 WL 2191978, at *6 n. 8 (Tex.App.—Austin May 22, 2014, no pet.) (mem.op.) (holding that mother's complaint about aggravated circumstances finding in temporary order, even in context of best interest complaint, was moot and not subject to appellate review after rendition of final termination order); *In re D.W.,* Nos. 01–13–00880–CV, 01–13–00883–CV, 01–13–00884–CV, 2014 WL 1494290, at *3 (Tex.

---

4. A person commits an offense under section 22.04 if he "intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child ... (1) serious

bodily injury; (2) serious mental deficiency, impairment, or injury, or (3) bodily injury. TEX. PENAL CODE ANN. § 22.04(a) (West Supp. 2015).

App.—Houston [1st Dist.] Apr. 11, 2014, no pet.) (mem.op.) (holding that where trial court had rendered final termination order, mother's complaint that evidence was insufficient to support appointment of Department as temporary sole managing conservator was moot and therefore not subject to appellate review) (mem.op.); *In re M.C.M.*, 57 S.W.3d 27, 37 (Tex.App.—Houston [1st Dist.] 2001, pet. denied) (holding complaint that temporary order that denied parents visitation violated Fifth and Fourteenth Amendments was moot in light of trial court's rendition of final judgment terminating parents' rights);

We find *M.Z.* particularly instructive. In that case, the trial court made a finding of aggravated circumstances, waiving the service plan as to mother and father. *M.Z.*, 2014 WL 2191978, at *2. Ultimately, the trial court rendered an order terminating the parents' rights to their child. *Id.* On appeal, mother, as part of her sufficiency challenge to the trial court's best interest finding, took issue with the lack of services provided to her by the Department due to the trial court's temporary order that contained a finding of aggravated circumstances, which waived the service plan requirement. *Id.* at *6 n.8. The court of appeals held that because a final termination order had been rendered, "the temporary orders are moot and not subject to review on appeal." *Id.* We hold the same is true here. Father raises two issues in the context of the trial court's best interest

finding in which he challenges the aggravated circumstances findings in the temporary orders based on standard of proof and constitutional considerations. We hold Father's complaints about the aggravated circumstances findings in the temporary orders are moot and as such, are not subject to appellate review.[5] *See id.* Accordingly, we decline to address Father's first and second issues.

### Best Interests—Sufficiency

■ In Father's third issue, he challenges the sufficiency of the evidence to support the trial court's best interest finding. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). As previously noted, Father has not challenged the trial court's findings with regard to the grounds for termination. *See id.* § 161.001(b)(1)(D), (E).

### Standard of Review

■ Under the Code, a court has authority to terminate a parent's rights to a child only upon proof by clear and convincing evidence that the parent committed an act prohibited by section 161.001(b)(1) of the Code, and that termination is in the best interest of the child. *Id.* § 161.001(b)(1), (2); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex.2009); *In re B.R.*, 456 S.W.3d 612, 615 (Tex.App.—San Antonio 2015, no pet.). In the Code, "clear and convincing evidence" is defined as "proof that will produce in the mind of the trier of

---

5. We also note that during the final hearing before the associate judge, the Department sought to introduce into evidence both temporary orders in which the associate and district judges found aggravated circumstances. At that time, Father's attorney specifically stated he had "no objection" to the introduction of the orders. The court admitted the orders as the Department's Exhibits 2 and 3. Thus, it could be said Father waived any complaint relating to the aggravated circumstances find-

ings. *Cf. Austin v. Weems,* 337 S.W.3d 415, 425 (Tex.App.—Houston [1st Dist.] 2011, no pet.) (holding that by affirmatively stating "no objection" when previously objected to evidence was offered, appellant waived complaint); *Pojar v. Cifre,* 199 S.W.3d 317, 341 (Tex.App.—Corpus Christi 2006, pet. denied) (holding that party who affirmatively asserts "no objection" waives error with regard to admission of evidence).

fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2008); *see J.O.A.*, 283 S.W.3d at 344; *B.R.*, 456 S.W.3d at 615. This heightened standard of review is mandated because termination of a parent's rights to a child implicates due process in that it results in permanent and unalterable changes for both parent and child. *In re E.A.G.*, 373 S.W.3d 129, 140 (Tex.App.—San Antonio 2012, pet. denied). Therefore, when reviewing a trial court's best interest finding in a termination order, we must determine whether the evidence is such that a fact finder could reasonably form a firm belief or conviction that termination was in the child's best interest. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex.2005) (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex.2002)).

▇▇ With regard to legal sufficiency challenges in termination cases, we view the evidence in the light most favorable to the trial court's finding and judgment, and any disputed facts are resolved in favor of that court's findings if a reasonable fact finder could have so resolved them. *Id.* We are required to disregard all evidence that a reasonable fact finder could have disbelieved, and we must consider undisputed evidence even if such evidence is contrary to the trial court's findings. *Id.* In summary, we consider evidence favorable to termination if a reasonable fact finder could, and we disregard contrary evidence unless a reasonable fact finder could not. *Id.*

▇▇ In a factual sufficiency review, we also give due deference to the trier of facts findings, avoiding substituting our judgment for the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex.2006). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder

could not reasonably have formed a firm belief or conviction [in the truth of its finding], then the evidence is factually insufficient." *Id.* (quoting *J.F.C.*, 96 S.W.3d at 266).

▇▇ We must remain mindful, however, that we may not weigh a witness's credibility because it depends on appearance and demeanor, and these are within the domain of the trier of fact. *J.P.B.*, 180 S.W.3d at 573. Even when such issues are found in the appellate record, we must defer to the fact finder's reasonable resolutions. *Id.* As the supreme court warned in its response to dissenting opinions in a termination case:

> Both dissents effectively second-guess the trial court's resolution of a factual dispute by relying on evidence that is either disputed, or that the court could easily have rejected as not credible. Even under the standard we articulated in *In re J.F.C.*, this reweighing of the evidence is improper. [citation omitted] And in a case like this, where so much turns on the witnesses' credibility and state of mind, appellate factfinding is particularly dangerous.

*In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003).

### Applicable Law

▇▇ In making a best interest determination, we may take into account the factors set forth by the Texas Supreme Court in *Holley v. Adams*: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency

seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. 544 S.W.2d 367, 371–72 (Tex. 1976). These considerations, i.e., "the *Holley* factors," are neither all-encompassing nor does a court have to find evidence of each factor before terminating the parent-child relationship. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex.2002). Thus, as the supreme court has held, "The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *Id.* In conducting our analysis of the *Holley* factors, "we focus on the best interest of the child, not the best interest of the parent." *In re D.M.*, 452 S.W.3d 462, 470 (Tex.App.—San Antonio 2014, no pet.).

■■■ Although proof of acts or omissions under section 161.001(b)(1) of the Texas Family Code does not relieve the Department from proving the best interest of the child, the same evidence may be probative of both issues. *C.H.*, 89 S.W.3d at 28 (citing *Holley*, 544 S.W.2d at 370; *Wiley v. Spratlan*, 543 S.W.2d 349, 351 (Tex.1976)); *B.R.*, 456 S.W.3d at 615. In conducting a best interest analysis, a court may consider circumstantial evidence, subjective factors, and the totality of the evidence, in addition to direct evidence. *B.R.*, 456 S.W.3d at 616 (citing *In re E.D.*, 419 S.W.3d 615, 620 (Tex.App.—San Antonio 2013, pet. denied)). Additionally, a fact finder may judge a parent's future conduct by his or her past conduct in determining whether termination of the parent-child

relationship is in the best interest of the child. *Id.*

■■■ Moreover, although we must accept the strong presumption that maintaining the parent-child relationship is in a child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex.2006) (per curiam), we also presume that permanently placing a child in a safe environment in a timely manner is in the child's best interest. *B.R.*, 456 S.W.3d at 615; *see* Tex. Fam. Code Ann. § 263.307(a) (West 2014). In determining whether a parent is willing and able to provide the child with a safe environment, the court should consider the factors set out in section 263.307(b), which include: (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department or other agency; (5) whether the child is fearful of living in, or returning to, the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether

the child's family demonstrates adequate parenting skills; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE ANN. § 263.307(b); *see In re G.C.D.*, No. 04–14–00769–CV, 2015 WL 1938435, at *4 (Tex. App.—San Antonio Apr. 29, 2015, no pet.) (mem.op.) (citing *In re A.S.*, No. 04–14–00505–CV, 2014 WL 5839256, at *2 (Tex. App.—San Antonio Nov. 12, 2014, pet. denied) (mem.op.)); *B.R.*, 456 S.W.3d at 615.

### The Evidence

In reviewing the evidence, we have considered the *Holley* factors as well those as set out in section 263.307(b) of the Texas Family Code. *See* TEX. FAM. CODE ANN. § 263.307(b); *Holley*, 544 S.W.2d at 371–72. We have also considered the acts or omissions as found by the trial court under section 161.001(b)(1) of the Code, as well as the circumstantial evidence, any subjective factors, and the totality of the evidence. *See In re R.S.D.*, 446 S.W.3d 816, 820 (Tex.App.–San Antonio).

#### 1. *Desires of the Child*

Julia—A.K.'s paternal great-aunt—testified she kept A.K. for several days in early October of 2014. When she told A.K. they were going to see Father the next day, A.K. said "no daddy, no daddy, no daddy." *See* TEX. FAM. CODE ANN. § 263.307(b)(5) (whether child is fearful of returning home); *Holley*, 544 S.W.2d at 371–72. Julia testified this was unusual because in the past she was happy when Father came into the room or to pick her up. When Julia asked if A.K. wanted to see Father, A.K. again said, "no daddy." *See* TEX. FAM. CODE ANN. § 263.307(b)(5); *Holley*, 544 S.W.2d at 371–72. Julia returned A.K. to Father and Ronda. When A.K. saw Father, she clung to Julia, saying "no daddy, no daddy" and "take me with you." *See* TEX. FAM. CODE ANN. § 263.307(b)(5); *Hol-*

*ley*, 544 S.W.2d at 371–72. *Id.* When Father placed her in the car seat, A.K. refused to allow him to buckle her in; Julia ultimately buckled A.K. into her car seat. A.K. continued to protest and according to Julia "worked herself up so much that she throw [sic] up." *See* TEX. FAM. CODE ANN. § 263.307(b)(5); *Holley*, 544 S.W.2d at 371–72.

Julia and her husband kept A.K. on and off from October 2014 through November 2014. Julia testified it was stressful returning A.K. to Father each time because she did not want to go. A.K. showed fear—crying, saying she did not want to go. *See* TEX. FAM. CODE ANN. § 263.307(b)(5); *Holley*, 544 S.W.2d at 371–72. Julia had to cajole A.K. to go to her Father, encouraging A.K. by telling her Father would give her hugs and kisses and play with her.

When the Department removed A.K. from Father in December 2014, she was placed with Julia and her husband. Julia testified A.K. never asks for her Father or Ronda. *See Holley*, 544 S.W.2d at 371–72. Once, during prayers before bedtime, A.K. looked up at the ceiling and said, "no more hitting me. Okay? No more hitting me, Mommy. No more hitting me Daddy? Okay." *See* TEX. FAM. CODE ANN. § 263.307(b)(5); *Holley*, 544 S.W.2d at 371–72. Julia testified she could feel A.K.'s fear of Father and knew this was "why she did not want to go back to him." *See* TEX. FAM. CODE ANN. § 263.307(b)(5); *Holley*, 544 S.W.2d at 371–72. Julia testified that as recently as two days before the trial, A.K. expressed that she did not want to see Father. *See Holley*, 544 S.W.2d at 371–72.

The evidence shows A.K. feared returning to her father, preferring to stay with Julia and her husband. *See* TEX. FAM. CODE ANN. § 263.307(b)(5); *Holley*, 544 S.W.2d at 371–72. Father recognized

A.K.'s preference when, in late November, he told Julia that he wanted A.K. to remain at his home more because she preferred being at Julia's and had asked a couple of times if she could to back to Julia's, stating that she missed her great-aunt and great-uncle. *See Holley*, 544 S.W.2d at 371–72. The trial court could have determined that A.K.'s fear of returning to Father was relevant in determining A.K.'s desires as to placement for purposes of best interests. *See* TEX. FAM. CODE ANN. § 263.307(b)(5); *In re J.J.*, No. 07–13–00117–CV, 2013 WL 4711542, at *8 (Tex.App.—Amarillo Aug. 29, 2013, no pet.) (mem.op.) (holding that where child had not clearly expressed desire regarding conservatorship, child's fear of man who resembled father was relevant to child's desire to remain with adoptive family rather than father for purposes of best interest determination).

At the time of the foregoing events, A.K. was two or three-years-old. A.K.'s age renders her vulnerable if left in the custody of a parent who is abusive or fails to attend to her needs. *See* TEX. FAM. CODE ANN. § 263.307(b)(1) (child's age and mental and physical vulnerabilities); *Holley*, 544 S.W.2d at 371–72; *In re J.G.M.*, No. 04–15–00423–CV, 2015 WL 6163204, at *3 (Tex.App.—San Antonio Oct. 21, 2015, no pet.) (mem op.).

*2. Emotional & Physical Needs/Emotional & Physical Danger/Parenting Abilities*

As noted above, A.K. is a young child. She will, therefore, require constant emotional and physical support. *See* TEX. FAM. CODE ANN. § 263.307(b)(1); *Holley*, 544 S.W.2d at 371–72. She is dependent solely upon a caregiver for her needs and for protection. *See* TEX. FAM. CODE ANN. § 263.307(b)(1); *Holley*, 544 S.W.2d at 371–72. This need for emotional and physical support will continue for many years. *See* TEX. FAM. CODE ANN. § 263.307(b)(1); *Holley*, 544 S.W.2d at 371–72.

With regard to the potential emotional and physical danger to A.K. if she were to be returned to Father, as well as Father's parenting abilities or lack thereof, we again note that Father has not challenged the trial court's findings that he: (1) knowingly placed A.K. or allowed her to remain in conditions or surroundings that endangered her physical or emotional well-being; and (2) engaged in conduct or knowingly placed A.K. with someone who engaged in conduct that endangered her physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). And while this does not relieve the Department from proving termination is in A.K.'s best interest, Father's decision to engage in conduct that endangered A.K. is probative on the issue of her best interest. *See C.H.*, 89 S.W.3d at 28; *B.R.*, 456 S.W.3d at 615.

The Department called six witnesses—three Department employees, a doctor, an investigator with the Guadalupe County Sheriff's Office, and A.K.'s great-aunt. Each of these witnesses provided testimony relevant to the danger to A.K. as a result of Father's actions or inactions. The same testimony is relevant to Father's parenting abilities.

*Ida Aguilar—Department Investigator*

Ms. Aguilar was the Department investigator who first contacted the family in August 2014 after the Department received information that A.K. was being physically abused. When she met with Father, she learned Father's girlfriend, Ronda, was A.K.'s primary caretaker because Father left early for work and worked long days. Father admitted to Ms. Aguilar that A.K. was under their care and no other individual took care of A.K. at that time. *See* TEX. FAM. CODE ANN. § 263.307(b)(9) (whether perpetrator of

harm to child is identified). Ms. Aguilar testified that when she saw two-year-old A.K., she noted bruises on A.K.'s face, in particular a bruise under her eye, as well as bruises to the cheeks, forehead, and one on the neck. *See* TEX. FAM. CODE ANN. § 263.307(b)(3) (magnitude, frequency, and circumstances of harm to child); *id.* § 263.307(b)(7) (history of abusive conduct by child's family or others with access to child's home); *id.* § 263.307(b)(12) (whether child's family demonstrates adequate parenting skills); *Holley*, 544 S.W.2d at 371–72. In her report, she noted scratches on A.K.'s face, as well as bald spots on her head. *See* TEX. FAM. CODE ANN. § 263.307(b)(3); *id.* § 263.307(b)(7); *id.* § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. Father told Ms. Aguilar the injuries were self-inflicted by A.K. during temper tantrums or were the result of accidental falls. *See* TEX. FAM. CODE ANN. § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. As to injury under A.K.'s eye, Father stated A.K. hit herself in the face with her sippy cup. *See* TEX. FAM. CODE ANN. § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. However, while Ms. Aguilar was at the home, A.K. had a tantrum, but did not attempt to injure herself. Moreover, Ms. Aguilar testified that in her experience, the injuries she observed were "not consistent with temper tantrums." Ms. Aguilar testified that although the Department did not remove A.K. after her initial visit, she took photographs and referred the matter for further action because she believed there had been physical abuse; the injuries she observed were inconsistent with Father's claims that the injuries were self-inflicted or the result of accidents. *See* TEX. FAM. CODE ANN. § 263.307(b)(12).

Ms. Aguilar saw A.K. again in late September and noticed new bruising on the child's face. *See* TEX. FAM. CODE ANN. § 263.307(b)(3); *id.* § 263.307(b)(4)

(whether child has been victim of repeated harm after initial report and intervention by Department or other agency); *id.* § 263.307(b)(7); *id.* § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. Father advised that his girlfriend told him A.K. tripped over a toy and fell. *See* TEX. FAM. CODE ANN. § 263.307(b)(9), *id.* § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. Ms. Aguilar testified about the November referral to the Department by the hospital after Julia brought A.K. in for injuries she believed were the result of physical abuse. *See* TEX. FAM. CODE ANN. § 263.307(b)(3); *id.* § 263.307(b)(4); *id.* § 263.307(b)(7); *id.* § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. According to Ms. Aguilar, it was at this time that the Department sought to remove A.K. from Father. By this time, the Department had been investigating the family for approximately three months and had obtained pictures from different times during this period showing injuries to A.K. *See* TEX. FAM. CODE ANN. § 263.307(b)(3); *id.* § 263.307(b)(4); *id.* § 263.307(b)(7); *id.* § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72.

*Maricella Patrice Luna—Department Investigator*

At the time of the events that are relevant to this appeal, Ms. Luna had been a Department investigator for two years. When the hospital contacted the Department in November 2014, Ms. Luna was the investigator on call. She went to the hospital where she met Julia and her husband as well as A.K.

Ms. Luna testified A.K. had "bruising to her face, a bite mark on her arm and abrasions on her nose." *See* TEX. FAM. CODE ANN. § 263.307(b)(3); *id.* § 263.307(b)(4); *id.* § 263.307(b)(7); *id.* § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. Ms. Luna identified ten photographs of A.K. that were taken at the

hospital. The photographs, which were admitted into evidence, show the following injuries on A.K.'s body: (1) a forehead scratch; (2) abrasions to the nose; (3) an abrasion and cut to her lip; (5) multiple facial bruises of differing ages; and (6) bruises on her wrist. *See* Tex. Fam. Code Ann. § 263.307(b)(3); *id.* § 263.307(b)(4); *id.* § 263.307(b)(7); *id.* § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. The information Ms. Luna obtained that evening prompted the Department to seek temporary managing conservatorship of A.K.

*Rocky Hensarling—Department Master Conservatorship Specialist*

Mr. Hensarling, who occupies the highest level of conservatorship work with the Department, testified he was assigned to A.K.'s case in early January 2015. He met with Father while Father was incarcerated based on his arrest for injury to a child. When Mr. Hensarling explained to Father that if Father did not injure A.K., he had to agree it was his girlfriend, Ronda. Father consistently refused to accept the idea, stating Ronda could not have injured A.K. Although Father agreed he was not home with them all the time and that A.K.'s injuries only occurred after Ronda moved in, Ronda "couldn't have and wouldn't have done that to his child." *See* Tex. Fam. Code Ann. § 263.307(b)(9); *id.* § 263.307(b)(11) (willingness and ability of family to effect positive environmental and person changes within reasonable time); *Holley*, 544 S.W.2d at 371–72. Father's explanation was that A.K. had temper tantrums and "was probably just jealous because she was used to a relationship with just her and daddy, and . . . she might have been acting out . . . to express her jealousy regarding his relationship" with Ronda and her children. Father claimed to have personally seen A.K. injure herself during tantrums. Even when Mr. Hensarling told Father he had seen A.K. have tantrums, yet she never injured

herself, and that she had in fact suffered no injuries like those previously suffered since her removal, it was clear to Mr. Hensarling that Father continued to place the blame for A.K.'s injuries solely and completely on A.K. Based on Father's statements, Mr. Hensarling stated he realized he would not be able to reason with Father with regard to the cause of A.K.'s injuries. *See* Tex. Fam. Code Ann. § 263.307(b)(9); *id.* § 263.307(b)(11); *id.* § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. Father's persistent belief—even in the face of evidence from experts—that A.K. caused her own injuries greatly concerned Mr. Hensarling, causing him to believe it would be impossible to prevent injuries to A.K. in the future except by terminating Father's parental rights. *See* Tex. Fam. Code Ann. § 263.307(b)(11); *id.* § 263 307(b)(12); *Holley*, 544 S.W.2d at 371–72.

When asked about his relationship with Ronda, Father stated that once they are released from jail, they intend to remain together. *See* Tex. Fam. Code Ann. § 263.307(b)(11); *id.* § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. He firmly believes Ronda has done nothing wrong and he plans to build a family with her. *See* Tex. Fam. Code Ann. § 263.307(b)(11); *id.* § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. Mr. Hensarling testified this showed that Father put his own needs for a partner or companion above the need to provide his child with a safe and stable home environment. *See* Tex. Fam. Code Ann. § 263.307(b)(11); *id.* § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. Father never expressed any intent to make changes for the well-being of A.K.

*Dr. Sarah Northropp*

Dr. Northropp, a fellow in child abuse pediatrics at the University of Texas Health Science Center of San Antonio, tes-

tified she was asked by the Department to consult on A.K.'s case. Initially, she reviewed the pictures taken by Ms. Aguilar in August 2014 and her summary. Dr. Northropp then requested A.K.'s medical records. She then received additional information, including photographs, from A.K.'s November hospital evaluation.

When asked about the injuries shown in the materials she received, Dr. Northropp testified A.K.'s injuries included: multiple bruises to her cheeks, lacerations inside and outside her lips, a bite mark, and bruising to her wrists and buttocks. *See* TEX. FAM. CODE ANN. § 263.307(b)(3); *id.* § 263.307(b)(4); *id.* § 263.307(b)(7); *id.* § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. She stated the bruises were not sustained in a single incident, but in at least two separate incidents. *See* TEX. FAM. CODE ANN. § 263.307(b)(3); *id.* § 263.307(b)(4); *Holley*, 544 S.W.2d at 371–72. When asked if the injuries could have been the result of accidental falls or temper tantrums, the doctor opined that in a fall, you would expect to see bruising on "bony prominences" like the forehead, nose, knees, shins, or elbows. *See Holley*, 544 S.W.2d at 371–72. Dr. Northropp also testified the types of injuries she observed in A.K.'s records were not usually the result of a temper tantrum, despite medical records showing Father had taken A.K. to a pediatrician because of tantrums. Rather, in a tantrum you would expect to see the same type of injuries as in an accidental fall—bruising to the knees, shins, or forehead. In fact, the doctor stated that when children do intentionally "bang" themselves during a tantrum, it is uncommon for them to bruise themselves, but when they do, it is usually to the forehead. Dr. Northropp concluded that A.K.'s injuries were neither accidental nor the result of a fall or temper tantrum. *See id.* She also concluded it was unlikely A.K. caused the injuries by striking herself with a sippy cup, as claimed by Father. Rather, the doctor believed A.K.'s injuries were "much more consistent with an inflicted injury," stating it would be difficult for a child of A.K.'s age to injure herself in the way shown in the photographs. *See id.* Dr. Northropp concluded A.K.'s injuries were "nonaccidental" and "nonself-inflicted," but rather consistent with "inflicted injuries." *See* TEX. FAM. CODE ANN. § 263.307(b)(3); *id.* § 263.307(b)(4); *id.* § 263.307(b)(9); *id.* § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. The doctor labeled the case as "high risk of physical abuse," noting that if A.K.'s injuries were the result of accidents or self-infliction, she would have expected the injuries to continue to occur when A.K. was away from Father and Ronda, but they did not. Dr. Northropp said she had no doubt the injuries were not self-inflicted, but caused by another person actively making contact with A.K. When pressed on cross-examination by Father's attorney, the doctor stated it would be "highly unlikely" for A.K.'s injuries to be accidental or self-inflicted.

*Robert Murphy—Guadalupe County Sheriff's Office Investigator*

Investigator Murphy testified he was dispatched to the hospital the night in November when Julia and her husband brought A.K. for injuries they believed resulted from abuse. Investigator Murphy met with A.K. and "saw bruises on the face ... a healing split lip ... some sort of injury to the corner of her mouth ... [and] possibly a bruise under her eye that appeared to be older than the current injuries." *See* TEX. FAM. CODE ANN. § 263.307(b)(3); *id.* § 263.307(b)(4); *Holley*, 544 S.W.2d at 371–72. Investigator Murphy began an investigation, obtaining medical records and interviewing family members. He attempted to interview Father and Ronda, but they invoked their right to counsel. Ultimately, Investigator

Murphy arrested Father and Ronda for the offense of injury to a child pursuant to section 22.04 of the Penal Code. *See* Tex. Fam. Code Ann. § 263.307(b)(3); *id.* § 263.307(b)(9); *Holley,* 544 S.W.2d at 371–72. At the time of his testimony, indictments against the two were pending.

But according to the investigator, the injury to a child offense was not the only criminal offense for which Father may need to answer. Investigator Murphy testified he was contacted by an investigator with the Converse Police Department who advised him there was an aggravated sexual assault charge against Father that was being presented by the Converse Police Department to the Bexar County District Attorney's Office. *See In re A.H.,* No. 04–15–00416–CV, 2015 WL 7565569, at *7 (Tex.App.—San Antonio Nov. 25, 2015, no pet.) (mem.op.) (recognizing that parent's criminal background is relevant to best interest determination). That offense concerned the sexual assault of a child. There was some suggestion in Julia's testimony that A.K. might have been sexually abused. Julia, who has a five-year-old daughter, testified A.K.'s vaginal entrance was "larger … than normal" and A.K. "fought" her during diaper changes, requiring a lot of reassurance. Julia stated A.K. seemed frightened when Julia would go near her private area, not wanting Julia to wipe or change her. Julia testified this raised "red flags" for her.

*"Julia"—A.K.'s Paternal Great–Aunt*

Julia, who is A.K.'s paternal great-aunt, began her testimony by stating that she has a close relationship with her family, including Father. According to Julia, Father worked and his live-in girlfriend, Ronda, was a stay-at-home mom, and would watch A.K.—and sometimes her own girls—during the day. Julia stated she noticed A.K. was always "lacking in hygiene, taken care of like a little ragamuffin

thing," and she and other family members would talk to Father, encouraging him to pay more attention to A.K.'s hygiene. *See* Tex. Fam. Code Ann. § 263.307(b)(12); *Holley,* 544 S.W.2d at 371–72. However, Julia became concerned for A.K.'s physical safety when she received some pictures of the child in a text in September 2014. The text, which was originally sent to other family members by Father and Ronda, contained a picture of A.K. with numerous bruises and scratches on her face, a black eye, and a "busted lip." *See* Tex. Fam. Code Ann. § 263.307(b)(3); *id.* § 263.307(b)(12); *Holley,* 544 S.W.2d at 371–72. The bruises were of different colors and sizes. *See* Tex. Fam. Code Ann. § 263.307(b)(3); § 263.307(b)(12); *Holley,* 544 S.W.2d at 371–72. Two of the pictures showed Ronda holding A.K.'s arms in downward position, and there was blood smeared all over A.K.—her face, hands, arms, and chest. The pictures, which were taken by Father on September 25, 2014, were admitted into evidence. Father claimed A.K. "had a fit and busted her lip." He claimed the black eye was the result of falling off the bed. *See* Tex. Fam. Code Ann. § 263.307(b)(11); *id.* § 263.307(b)(12); *Holley,* 544 S.W.2d at 371–72.

In early October 2014, Julia began babysitting A.K. at Father's request, keeping her from October 9th through the 13th. According to Julia, A.K. was extremely thirsty and hungry, drinking two full sippy cups and stuffing her mouth with food while asking for more. After changing the two-year-old's diaper, Julia noticed that a bad smell continued to emanate from A.K.'s private area. Upon inspection, A.K. had "gunk everywhere … [s]he wasn't clean down there." *See* Tex. Fam. Code Ann. § 263.307(b)(12); *Holley,* 544 S.W.2d at 371–72. At bath time, when Julia attempted to use the spray nozzle, A.K. was fearful and stated, "no hot water, no hot

water, no hot water." After Julia let her feel the water, A.K. relaxed.

Although A.K. slept well the first weekend she was with Julia, at other times when Julia babysat, A.K. would have nightmares. And, as set out above, she was fearful of returning home, clinging to Julia and saying "no daddy." *See Holley*, 544 S.W.2d at 371–72. Even on that first weekend when it came time to return A.K. to her father, A.K. resisted being belted into the car seat in Father's vehicle. *See id.*

Julia was asked to babysit again and picked A.K. up on October 16th and kept her until October 24th. When Julia picked up A.K. this time, she noticed A.K. seemed scared and she "had a big red spot on her eyeball ... bruises on her cheeks ... a bite mark on her forehead along with a bruise." *See* TEX. FAM. CODE ANN. § 263.307(b)(3); *id.* § 263.307(b)(7); *id.* § 263.307(b)(11); *id.* § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. It also appeared she had bite marks on her cheek and arms." *See* TEX. FAM. CODE ANN. § 263.307(b)(3); *id.* § 263.307(b)(7); *id.* § 263.307(b)(11); *id.* § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. When Julia got the child home, she pulled back her hair and saw a "bald red spot and then two different scabs of different sizes " *See* TEX. FAM. CODE ANN. § 263.307(b)(3); *id.* § 263.307(b)(7); *id.* § 263.307(b)(11); *id.* § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. Julia took pictures of A.K.'s injuries on October 16th; the photographs were admitted into evidence. Julia testified these injuries were different from those she saw in September. *See* TEX. FAM. CODE ANN. § 263.307(b)(3); *id.* § 263.307(b)(7); *id.* § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. During the visit, A.K. suffered from nightmares, but they tapered off the longer she was with her great-aunt and great-uncle.

Julia testified she usually picked A.K. up and returned her at a neutral location. She explained that Father did not want to give out his address—even to family. Father claimed Ronda and her girls would be there alone "and he did not want friends from high school to find out to come give them problems." Julia did not understand why that meant family members could not have his address, but Father became upset even when his own mother would show up unannounced. However, on one occasion, October 26th, Father permitted Julia to pick A.K. up at his home, giving her the address. Julia testified the house smelled like "dog poop," but they did not have a dog, and all three girls—A.K. and Ronda's daughters—had full "pee diapers." *See* TEX. FAM. CODE ANN. § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. Upon arrival, Father told Julia that A.K. "had pulled some hair out of the side of her skull." *See* TEX. FAM. CODE ANN. § 263.307(b)(3); *id.* § 263.307(b)(7); *id.* § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. It also appeared that A.K. had a faint bite mark on her body. *See* TEX. FAM. CODE ANN. § 263.307(b)(3); *id.* § 263.307(b)(7); § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. A.K. smelled and her hair was dirty. *See* TEX. FAM. CODE ANN. § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. It seemed she had not been bathed and she was hungry and thirsty. A.K. stayed with Julia's family from October 26th through November 7th.

On November 9th, Julia again picked up A.K. When Father arrived with A.K., he and Ronda "were mad and defensive." *See* TEX. FAM. CODE ANN. § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. Father stated that when Ronda was bathing A.K., the child "just started banging her head against the walls" and was crying because soap was in her eyes. Father claimed A.K. then grabbed the shower nozzle and

"just started banging that against her lip." Father said the child was "flailing" and pulled down the shower curtain and rod. He claimed he dried her off and placed A.K. on her bed. Hearing "muffled sounds," he and Ronda opened the door and A.K. "had her hand stuck in her mouth trying to bite ... when they pulled her hand out ... a gush of blood came out of her mouth with a chunk of her tongue." Julia said was shocked by what she heard. Father showed Julia that A.K. had bruises on her arms and elsewhere; Father claimed the bruises were self-inflicted. Father did not appeared concerned about A.K.'s injuries; rather, he was angry at the child. *See* TEX. FAM. CODE ANN. § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72.

When Julia got home with A.K., she again photographed the child's injuries. Julia stated she took the photographs because every time she picked up A.K. she had different injuries. This time, there was bruising on the cheeks, arms, and back. *See* TEX. FAM. CODE ANN. § 263.307(b)(3); *id.* § 263.307(b)(7); *id.* § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. There were scratches on and beneath her nose, "she had a busted lip," and there was a gash to her tongue. *See* TEX. FAM. CODE ANN. § 263.307(b)(3); *id.* § 263.307(b)(7); *id.* § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. According to Julia, A.K. told her great-uncle that her lip hurt. When he asked her what happened, A.K. said "Momma Ronda" hit me. *See* TEX. FAM. CODE ANN. § 263.307(b)(9); *id.* § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. He asked her again, and she gave the same response. During this visit, A.K. was clingy, acting scared and withdrawn. Usually after several hours with Julia, A.K. would become happy, but not this time.

Julia testified she and other family members spoke to Father about the child's injuries. Julia testified they told Father the stories of A.K.'s alleged self-inflicted injuries did not add up, and it was almost as if Father was describing a different child based on her experience with A.K. Julia testified she never saw the child inflict injuries upon herself.

Julia returned A.K. to Father on November 21st. She and her husband decided that if A.K. had injuries the next time they saw her, they would take her to the hospital. When they picked her up on November 28th, A.K. was not acting normally, instead of talking, which she did very well, she was "gibbering." At lunch, A.K. said her "butt hurt." Julia discovered bruises to the child's back and buttocks. *See* TEX. FAM. CODE ANN. § 263.307(b)(3); *id.* § 263.307(b)(7); *id.* § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. A.K. also had scratches and bruises on her face and arms, and injuries to the inside and outside of her lower lip. *See* TEX. FAM. CODE ANN. § 263.307(b)(3); *id.* § 263.307(b)(7); *id.* § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. Julia testified these injuries were new and not the same injuries A.K. exhibited when she picked A.K. up on November 9th. Julia stated she and her husband took A.K. to the hospital to be examined for potential physical abuse. After A.K. was examined, the hospital staff called the Department and law enforcement officials.

After the Department removed A.K. and placed her with Julia's family, A.K. pointed to her face and told Julia that "Momma Ronda hit me and daddy hit me." *See* TEX. FAM. CODE ANN. § 263.307(b)(9); *id.* § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. She also pulled her own hair and referred to Ronda. *See* TEX. FAM. CODE ANN. § 263.307(b)(9); *id.* § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72.

### 3. Plans for Child by Those Seeking Custody/Stability of Home or Proposed Placement

As noted above, Father told Mr. Hensarling that he intends to continue his relationship with Ronda and build a family with her. See Holley, 544 S.W.2d at 371–72. The lack of stability with regard to this situation is apparent from the evidence detailed above. The evidence shows that when A.K. is in a home with Father and Ronda, she suffers injuries. See TEX. FAM. CODE ANN. § 263.307(b)(3); id. § 263.307(b)(4); id. § 263.307(b)(7); Holley, 544 S.W.2d at 371–72. The Department investigators and medical expert all agree the injuries are not, as Father maintains, self-inflicted or the result of accidents. Rather, A.K. suffered her injuries at the hands of Father, Ronda, or both of them. See TEX. FAM. CODE ANN. § 263.307(b)(3); id. § 263.307(b)(4); id. § 263.307(b)(7); Holley, 544 S.W.2d at 371–72. Moreover, it is clear from Julia's testimony that Father and Ronda, at least for a time, preferred to have A.K. out of the home for significant periods, asking Julia and her husband to take care of A.K. The abuse and constant movement shows a distinct lack of stability in the home shared by Father and Ronda. See Holley, 544 S.W.2d at 371–72.

On the other hand, the evidence presented showed Julia and her husband have a very stable home and A.K. is thriving there, suffering no injuries other than a bruise when she fell off a sofa. See id. In fact, Mr. Hensarling stated he has taken pictures of A.K. during visits—the photographs were admitted into evidence—and A.K. "likes to show that she has no owies." Mr. Hensarling testified he has visited Julia's home seven times. He stated the home is clean and comfortable. See id. Julia and her husband have two other children—a girl who is five and a two-year-old

boy. Mr. Hensarling says all three children "act like brother and sisters" and interact very appropriately for their ages. See id.

Mr. Hensarling testified he has frequently discussed future plans for A.K. with Julia and her husband and their role in those plans. According to Mr. Hensarling, if Father's parental rights are terminated—which he contends would be in A.K.'s best interest—Julia and her husband intend to adopt A.K. See id. The couple is in the process of obtaining the necessary certifications and licenses for that purpose. Mr. Hensarling stated he believes the couple are genuine in their desire to adopt A.K. and provide a home for her. Although Julia and her husband do not believe in childhood immunizations, they have taken A.K. for all suggested immunizations and will continue to follow Department recommendations.

Julia testified her husband is self-employed and they are financially comfortable. She said they are able to provide for A.K. Julia stated she and her husband want to adopt A.K. and would love her as if she was their own biological child. See id. A.K. has bonded with their other children and they refer to each other as brother and sister as opposed to cousins. They are in the process of adding on a bedroom to their home for A.K.

Mr. Hensarling summed up his opinions as to termination of Father's rights and permanent placement for A.K. in the home of her great-aunt and great-uncle stating:

> I really feel like it's in her best interest. [Great-aunt and great-uncle] have continued to demonstrate that that's something that they also desire. It's just— it's the home is safe. It's stable. They're able to provide her with an appropriate amount of love and affection. They meets all of her basic needs … they meet her medical needs, her emo-

tional needs, her social needs. I have no doubt that they would meet her educational needs as those arise as she becomes school age. So I honestly cannot think of any reasons why they would not be in a much better position or in a much better situation for her instead of returning home.

*See id.*

4. *Acts or Omissions Indicating Parent–Child Relationship Not Proper/Excuses*

The evidence of acts or omissions by Father that indicate he had an improper relationship with A.K. are those set forth above in our discussion of the abuse suffered by A.K.—physically and emotionally. *See* TEX. FAM. CODE ANN. § 263.307(b)(3); *id.* § 263.307(b)(4); *id.* § 263.307(b)(7); *id.* § 263.307(b)(12); *Holley,* 544 S.W.2d at 371–72. Although Father continually claimed A.K.'s injuries were self-inflicted during tantrums or the result of accidental falls, neither Ms. Aguilar nor Dr. Northropp found A.K.'s injuries to be consistent with that contention. *See* TEX. FAM. CODE ANN. § 263.307(b)(9); *Holley,* 544 S.W.2d at 371–72. Mr. Hensarling attempted to reason with Father, pointing out that he saw A.K. during tantrums and she did not injure herself. Moreover, no injuries like the ones A.K. previously sustained occurred *after* she was removed from Father and Ronda. *See* TEX. FAM. CODE ANN. § 263.307(b)(9); *Holley,* 544 S.W.2d at 371–72. Nevertheless, Father persisted in his claim that A.K. caused her own injuries. *See* TEX. FAM. CODE ANN. § 263.307(b)(11); *Holley,* 544 S.W.2d at 371–72. Thus, at best, the evidence shows Father stood by and permitted his girlfriend, Ronda, to abuse A.K., taking no action to stop the abuse and inventing stories to cover it up. *See* TEX. FAM. CODE ANN. § 263.307(b)(11); *Holley,* 544 S.W.2d at 371–72. At worst, there is evidence to

establish Father himself committed acts of abuse. *See* TEX. FAM. CODE ANN. § 263.307(b)(11); *Holley,* 544 S.W.2d at 371–72. Moreover, despite being confronted with evidence from Department employees and a doctor that A.K.'s injuries were neither accidental nor self-inflicted, as Father continued to maintain, Father stated his intention, once released from confinement, to continue his relationship with Ronda and build a family with her. *See* TEX. FAM. CODE ANN. § 263.307(b)(11); *Holley,* 544 S.W.2d at 371–72.

*Application of the Law to the Evidence*

The evidence shows A.K. is fearful of her father and would rather remain with Julia and her husband. *See Holley,* 544 S.W.2d at 371–72. There is also a substantial amount of evidence to suggest that A.K.'s injuries were not, as Father insists, self-inflicted or accidental, but inflicted by some other individual. *See* TEX. FAM. CODE ANN. § 263.307(b)(9); *Holley,* 544 S.W.2d at 371–72. Father agreed that when A.K. was injured, she was in his care and custody or in the care and custody of his girlfriend. *See* TEX. FAM. CODE ANN. § 263.307(b)(9); *Holley,* 544 S.W.2d at 371–72. Yet, Father denies injuring A.K. and refuses to believe Ronda injured her. *See* TEX. FAM. CODE ANN. § 263.307(b)(11); *Holley,* 544 S.W.2d at 371–72. However, Father does not contest that he committed acts or omissions under section 161.001(b)(1)—engaging in conduct that injured A.K. or leaving her with someone who did. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E); *see also C.H.,* 89 S.W.3d at 28. Despite A.K.'s injuries—and the likelihood that such injuries were caused by his girlfriend—Father affirmatively stated he intends to stay with Ronda and build a family with her. *See* TEX. FAM. CODE ANN. § 263.307(b)(11); *Holley,* 544 S.W.2d at 371–72.

A.K. is currently in a stable home with her great-aunt, great-uncle, and their children where her needs are met and she is loved and cared for. *See Holley*, 544 S.W.2d at 371–72. A.K. has not suffered the sort of injuries that brought the Department in since she was placed with her great-aunt and great-uncle. *See id.* Julia and her husband have agreed to adopt A.K. in the event Father's parental rights are terminated. *See id.*

In sum, the relevant *Holly* factors weight heavily in favor of a finding that termination was in A.K.'s best interest. Accordingly, recognizing that in conducting a best interest analysis, the trial court was permitted to (1) consider circumstantial evidence, subjective factors, and the totality of the evidence, in addition to the direct evidence presented, and (2) judge Father's future conduct by his past conduct, we hold the trial court was within its discretion in finding termination of Father's parental rights would be in A.K.'s best interest. *See B.R.*, 456 S.W.3d at 616. In other words, we hold the evidence is such that the trial court could have reasonably formed a firm belief or conviction that termination was in the child's best interest. *See J.P.B.*, 180 S.W.3d at 573.

## CONCLUSION

Based on the foregoing, we hold: (1) Father's complaints about the aggravated circumstances findings in the temporary orders are moot and therefore, are not subject to appellate review; and (2) the evidence is legally and factually sufficient to permit the trial court, in its discretion, to find termination was in A.K.'s best interest. We therefore overrule Father's issues and affirm the trial court's termination order.