

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-21-00278-CV

———————————————

IN THE INTEREST OF B.A., B.W., AND B.W., CHILDREN

On Appeal from the 393rd District Court
Denton County, Texas
Trial Court No. 19-0707-431

Before Womack, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

Appellant C.H. (Mother) appeals the trial court's order terminating her parental rights to her children B.A. (Barbara), B.W. (Bella), and B.W. (Bristol) (collectively the Children).[1] In her sole issue on appeal, Mother argues that she was deprived of due process as a result of the actions and comments of the trial judge who presided over the early part of this case (the former trial judge). She alleges that the former trial judge was biased and prejudiced, that he advocated on behalf of the Department of Family and Protective Services (the Department), and that his sua sponte finding of aggravated circumstances denied her the opportunity to engage in services and deprived her of due process. Because Mother failed to object at the trial-court level to the complaints she now raises on appeal, and because the case was transferred from the former trial judge to a different trial judge (of whom Mother makes no complaint) who presided over a jury trial that culminated in the termination of Mother's parental rights, we hold that Mother's complaint is not preserved for our review. Thus, we will affirm.

---

[1]We use aliases to refer to the Children and their parents. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

## II. BACKGROUND

### A. Investigation and Removal

Mother and B.A. (Brad) are the parents of Barbara. Mother and L.W. (Levi) are the parents of Bella and Bristol.[2]

The Department became involved with Mother in June 2018, following a domestic incident in which Levi was alleged to have "pull[ed] a gun" on Mother. In August 2018, the Department again became involved with Mother after a domestic-violence incident between Levi and Mother that occurred while Barbara and Bella were present. As part of that investigation, Mother and Barbara were sent for drug testing; Barbara tested positive for cocaine; and Mother testified positive for marijuana.[3] The Department referred the case to Family-Based Safety Services,[4] and Barbara and Bella were placed with their maternal grandmother.[5]

---

[2]Brad voluntarily relinquished his parental rights to Barbara, and Levi voluntarily relinquished his parental rights to Bella and Bristol. The trial court terminated Brad's and Levi's respective parental rights based on those relinquishments. Brad and Levi do not appeal.

[3]Barbara was five at the time of the drug test.

[4]Family-Based Safety Services "is a CPS program that works with parents to try to keep children in the home." *In re D.C.*, No. 05-19-01217-CV, 2020 WL 1042692, at *1 (Tex. App.—Dallas Mar. 4, 2020, pet. denied) (mem. op.); *see* 40 Tex. Admin. Code § 700.710.

[5]Bristol had not been born at this time.

3

In January 2019, the Department removed Barbara and Bella following a third domestic-violence incident at Mother's apartment that occurred while Bella was present. That same month, the Department filed its petition to terminate Mother's parental rights to Barbara and Bella, and the case was assigned to the former trial judge.

## B. The Monitored Return, the Car Accident During the Period of the Monitored Return, and the Subsequent Removal

In November 2019, a different trial judge ordered a monitored return of Barbara and Bella to Mother. Two months later, Mother was driving approximately seventy miles per hour when her car rear-ended another vehicle. Barbara was in the back seat of Mother's car at the time of the accident, and Barbara was not in a car seat and was not wearing a seatbelt. Barbara was taken to the hospital after the accident, where she was treated for a fractured arm and a vaginal tear.

Medical personnel opined that Barbara's vaginal tear was not caused by the car accident but that it was consistent with sexual abuse. Mother initially refused to allow Barbara to be examined by a sexual assault nurse examiner (SANE), maintaining that Barbara's injury was not caused by sexual abuse. When a SANE examination was later attempted, the SANE nurse was unable to complete the evaluation due to the stitches and sutures in Barbara's vaginal area.

During a forensic interview after the car accident, Barbara told the interviewer that "she did not know if anyone had touched her private areas." Barbara also told

4

the interviewer that Mother had allowed her to drink an alcoholic drink while they were lying in bed one night. Mother denied ever giving Barbara alcohol. The Children's foster mother, however, later recounted an occasion when she had given Barbara a water bottle, Barbara had become upset, and Barbara had told the foster mother, "I don't want to drink fuzzy drink. . . . [S]ometimes I drink fuzzy drink when I go to bad places." The foster mother also recounted that Barbara had told her, "[Mother] said I have to say my stitches are from the car accident."

A few days after the car accident, the Department removed Barbara and Bella from Mother's care, and the former trial judge set a post-removal adversary hearing for February 2020. The Department also filed a new case requesting the termination of Mother's parental rights to Bristol—who had been born in September 2019—and it removed Bristol from Mother's care.

In the week following her removal, Bristol was exhibiting irritability, fussiness, inconsolability, heavy sweating, and tremors. As described by the Children's foster mother, Bristol "scream[ed] uncontrollably for a period of ten hours at one point." Bristol was taken to Children's Medical Center in Dallas, where she was diagnosed with drug withdrawal and where she stayed for three days.

## C. The Complained-Of Adversary Hearing Before the Former Trial Judge

A post-removal adversary hearing took place before the former trial judge over two days in February 2020. The complaints Mother makes now on appeal stem from

5

certain actions and comments may by the former trial judge at the post-removal adversary hearing.

## 1. Interrogation of Witnesses

Mother complains that at the hearing, the former trial judge "actively interrogated witnesses and [Mother] herself, effectively advocating for the Department." Mother points to four examples of this alleged interrogation of witnesses.

First, Mother points to questions that the former trial judge asked during Mother's cross-examination of a nurse, after the nurse testified that one of the Children had tested positive for COVID-19:

> [The Former Trial Judge]: I'm sorry, but I have to know. Do you all not ask, under those circumstances, ask questions about whether—obviously the child may not have traveled to China or a country where that virus has originated, but ask about international travel and contact that may have led to the child being exposed?
>
> [The Witness]: Always. That's actually—
>
> [The Former Trial Judge]: Did you—
>
> [The Witness]: That's actually prompted, and we do assess those.
>
> [The Former Trial Judge]: Did you find anything out in that regard?
>
> [The Witness]: There was no travel.
>
> [The Former Trial Judge]: Huh?
>
> [The Witness]: There was no international travel. Is that what you are—

[The Former Trial Judge]: Right. No reason to believe the child was exposed through someone else's international travel?

[The Witness]: Correct.

[The Former Trial Judge]: Is that virus now randomly occurring?

[The Witness]: There are hundreds of strains of Coronavirus, so this is basically a cold. So this is not the strain that we see in China. So that's—

[The Former Trial Judge]: I thought this was like a sudden Ebola outbreak.

[Mother's Attorney]: No, Your Honor.

[The Former Trial Judge]: Forgive us. Us lawyers are not real smart.

[The Witness]: When I saw that pop up, I thought, wow, she's not sick. But it shows she had an exposure.

[The Former Trial Judge]: All I could think about is how in the world is this infant being exposed to Coronavirus. Did not know that. Thank you.

[The Witness]: No. This is just basically a common cold.

[The Former Trial Judge]: I will resume being blissfully ignorant.

Second, Mother points to the following exchange that occurred during the Department's examination of one of its investigators, who was testifying about conversations with Mother regarding the car accident:

[The Former Trial Judge]: I'm sorry, then I got to interrupt. You said just a little while ago that [Mother] reported to you that [Barbara] was in the back seat.

[The Witness]: So the evening of the incident she was in the back seat because they were on their way to get the four-year-old. And the other

7

two children were still in daycare. I'm not sure as to why she wasn't in a car seat at that time, but the explanation was the other—

[The Former Trial Judge]: Okay. I'm just trying to make sure I'm not— I've heard you reference back and front both now.

[The Witness]: Yes.

[The Former Trial Judge]: So are you saying that she told you generally that [Barbara] will ride in the front seat, but at the time of the accident [Barbara] was in the back seat?

[The Witness]: That's correct.

[The Former Trial Judge]: Okay. Because the other children weren't in the car with them?

[The Witness]: They were not, yes.

[The Former Trial Judge]: Thank you for clarifying.

Third, Mother points to several questions that the former trial judge asked Mother following the Department's redirect examination of her. The complained-of questions included questions regarding Mother's marital status, Levi's incarceration, the identity of Bristol's father, whether Bristol had any Native American ancestry, whether Barbara cried during the car accident, the speed Mother was traveling during the car accident, whether she applied her brakes before the impact, the facts relating to how Barbara got into the back seat of the car on the day of the accident, whether the base of the car seat was in the car, whether the base of the car seat was buckled, and whether Mother had verified that Barbara was buckled in the car on the day of the accident.

Fourth, Mother points to the following exchange that occurred at the conclusion of the testimony from the Children's maternal grandmother:

[The Former Trial Judge]:  Ma'am, do you not realize that children [Barbara's] age and younger are supposed to be in car seats?

[The Witness]:  I did not know, because [Barbara] is not a little girl.  I was going by the weight requirement.

[The Former Trial Judge]:  So what's the weight requirement?

[The Witness]:  70 pounds.  I swear I thought it was 70 pounds.

[The Former Trial Judge]:  Where did you get that?

[The Witness]:  My kids are grown.

[The Former Trial Judge]:  I wouldn't necessarily expect you to know.

## 2.  Inappropriate Comments

Mother also complains that at the hearing, the former trial judge made certain comments that were inappropriate and demonstrated that he "harbored a deep-seated antagonism towards [Mother]."[6]  Mother points to the following statement made by the former trial judge just before both sides gave their closing arguments at the hearing:

---

[6]In its brief, the Department argues that the former trial judge made several favorable rulings to Mother and that he also expressed "anger and frustration" toward one of the Department's witnesses.  The Department points to an exchange the former trial judge had at a later hearing with a Department caseworker who was testifying as a witness, where the former trial judge stated, "Oh, my God, please answer the question.  You know the answer.  Give her the answer."  The former trial judge went on to tell the caseworker, "No, it is not appropriate.  My God, is it really that difficult to admit?  Please ask your next question.  Holy crap."

At best, that day mother committed the offense, the felony offense of endangering a child, at best. And, at best, mother committed the felony offense of injury to a child. I don't know why mother wasn't arrested. I don't know why mother has not been charged. But I have no control over that.

What I do know is that mother's direct actions, and not just omissions, actions, justified those two felony charges. And but for the grace of God we have not had to bury [Barbara]. And it seems like that's lost on everybody while we are arguing about sexual abuse. I don't know a parent, I guess I should say I don't know a good parent that wouldn't, with absolute certainty, verify that their child is buckled in the back seat if they are going to be hopping on the highway going 70 miles an hour. No good parent would find themselves in that situation.

Mother also points to the following exchange that occurred when the Children's foster mother was testifying regarding the Children's progress in her care:

[The Witness]: [Bristol] is also doing well. She didn't have any significant medical concerns during that time at all, or since. She has seasonal allergies. That's kind of the biggest medical thing. She has some displaced anger. She gets very angry at things and throws, hits, screams quite often. She stomps her feet. Again, she is 18 months old, so—

[The Former Trial Judge]: Have you ever met a woman that doesn't do that?

### 3. Sua Sponte Finding of Aggravated Circumstances

Mother also complains that at the hearing, the former trial judge made a sua sponte finding of aggravated circumstances which denied her the opportunity to engage in services and denied her due process. *See* Tex. Fam. Code Ann. § 262.2015. Mother claims that "it was clear from the outset that [the former trial judge] had already decided what he was going to do, and he would do anything to make sure that

10

the results in 'his' court met with his expectations." Mother points to a statement

made by the former trial judge at the conclusion of the first day of the hearing, where

he stated,

> I think the circumstances also may very well lead to an aggravated circumstances finding. So I would like you to think about that relative to the services the Department is asking for, and whether there should even be services at all, based on findings that the Court may be able to make relative to the allegations and the evidence presented so far.

Mother next points to a statement made by the former trial judge on the

second day of the hearing, prior to closing arguments, where he stated,

> I think there should be [an] aggravated circumstances finding. I don't think there is any need for a service plan at this point. I don't think there is any need for the Department to attempt to return the children to [M]other. I think there needs to be a jury trial set sooner rather than later. I will entertain your argument on why I shouldn't do that. That's what I am inclined to do.
>
> I understand there are other factors that extend beyond merely findin[g] that a parent has committed those offenses. But what is disturbing above all is that all this occurred, it would be one thing if this just happened, and I guess to some extent all parents are entitled to be given some deference that they won't be perfect and they will make mistakes. But this all happened at a time when [Mother] was under this Court's scrutiny, when [Mother] was under the Department's scrutiny, [the attorney ad litem's] scrutiny, CASA's scrutiny, at a time when she was supposed to be demonstrating to us that she can provide her children with a safe and stable environment. Bam. 70 miles an hour. Could have killed that child. Makes me sick. And I don't understand why, based on the evidence that has been presented, there's not just an aggravated circumstances finding and a trial set.

At the conclusion of the hearing, the former trial judge made a finding of

aggravated circumstances—even though the Department did not specifically request a

finding of aggravated circumstances—and he set a trial date for June 1, 2020. *See id.* The former trial judge later signed a written order finding aggravated circumstances against Mother.

## D. The Transfer to the 393rd District Court, the Jury Trial Before the 393rd District Court, and the Final Termination Order

On January 15, 2021,[7] the cases involving the Children were transferred from the 431st District Court to the 393rd District Court "as part of the reallocation of caseloads for the District Courts of Denton County." The case involving Barbara and Bella was later consolidated with the case involving Bristol.

In July 2021, the trial judge of the 393rd District Court presided over a nine-day jury trial on the merits of the Department's petition to terminate Mother's parental rights to the Children. At the conclusion of the trial, the jury unanimously found that Mother's parental rights to the Children should be terminated under predicate grounds (D), (E), and (O) and that termination of her parental rights was in the best interest of the Children. *See id.* § 161.001. The trial judge of the 393rd District Court later entered a final order of termination consistent with the jury's findings.[8] Mother appeals from that termination order.

---

[7]Although trial had been set for June 1, 2020, the trial date was continued due to the COVID-19 pandemic.

[8]The former trial judge's aggravated-circumstances finding was not mentioned in the jury charge, nor was it mentioned in the final order of termination. Moreover, the trial judge of the 393rd District Court granted Mother's limine request that the parties not reference the former trial judge's aggravated-circumstances finding.

12

## III. DISCUSSION

In her sole issue on appeal, Mother argues that the former trial judge was biased and prejudiced, that he advocated on behalf of the Department, and that his sua sponte finding of aggravated circumstances denied her the opportunity to engage in services and deprived her of due process. The Department counters that because Mother failed to object to any of the complained-of actions or comments by the former trial judge, Mother has failed to preserve the complaints she is now making on appeal. While Mother admits that "her appointed trial counsel failed to object to [the former trial judge's] unreasonable behavior and failed to request that [the former trial judge] recuse [himself]," Mother contends that her failure to object "does not operate as a waiver of error."

### A. The Law on Preservation

To preserve a complaint for appellate review, a party must present to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if not apparent from the request's, objection's, or motion's context. Tex. R. App. P. 33.1(a)(1)(A); *see also* Tex. R. Evid. 103(a)(1). If a party fails to do this, error is not preserved. *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g). With respect to a complaint regarding a trial judge's alleged improper conduct or comments, "[t]he claimant bears the burden to 'explain how any comments made by the trial judge were incurable or would excuse' the claimant's 'failure to preserve error.'" *In re Commitment of Stuteville*, 463 S.W.3d 543, 557 (Tex. App.—Houston [1st

13

Dist.] 2015, pet. denied) (quoting *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001)).

Error that falls within the narrow category of "fundamental error" requires no trial-court predicate for appellate review. *In re B.L.D.*, 113 S.W.3d 340, 350 (Tex. 2003). Fundamental error exists in rare instances in which error directly and adversely affects the interest of the public generally, as that interest is declared by the statutes or constitution of our state, or instances in which the record affirmatively and conclusively shows that the court rendering the judgment lacked subject-matter jurisdiction. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 577 (Tex. 2006).

Although not framed in terms of fundamental error, the Texas Supreme Court has recognized that claims of judicial bias would not be waived by a failure to object in the trial court if "the conduct or comment cannot be rendered harmless by proper instruction." *Dow Chem.*, 46 S.W.3d at 241. As we have explained previously, "[t]his 'limited,' 'narrow,' and 'rare' exception to the preservation-of-error requirements in civil cases essentially requires a harm analysis—the error 'probably caused the rendition of an improper judgment'—to determine if the error was incurable and, therefore, not subject to waiver." *In re L.S.*, No. 02-17-00132-CV, 2017 WL 4172584, at *16 (Tex. App.—Fort Worth Sept. 21, 2017, no pet.) (mem. op.) (first citing Tex. R. App. P. 44.1(a)(1); then citing *B.L.D.*, 113 S.W.3d at 350–51; then citing *In re K.R.*, 63 S.W.3d 796, 799–800 (Tex. 2001); and then citing *Dow Chem.*, 46 S.W.3d at 241).

14

## B. Application of the Law to the Facts

Here, it is undisputed that Mother did not object at the trial-court level regarding the complaints she now makes on appeal. And Mother does not argue that the trial court lacked subject-matter jurisdiction nor contend, let alone demonstrate, that the former trial judge's actions and comments directly and adversely affected the public interest as declared in the statutes or constitution of our state. *See Mack Trucks*, 206 S.W.3d at 577. Thus, the issue of whether Mother has preserved her complaints turns on whether the alleged error "probably caused the rendition of an improper judgment." *L.S.*, 2017 WL 4172584, at \*16.

Having reviewed the record and Mother's complaints, we cannot say that the alleged error "probably caused the rendition of an improper judgment." *See id.* The actions and comments made by the former trial judge that Mother complains of occurred at the post-removal adversary hearing in February 2020. Subsequent to that hearing, the case was transferred to the 393rd District Court, and the trial judge of the 393rd District Court—not the former trial judge—presided over a nine-day jury trial in July 2021. Mother makes no complaint regarding the trial judge of the 393rd District Court and no complaint regarding the July 2021 jury trial, and Mother does not explain how the actions and comments of the former trial judge impacted the results of the July 2021 jury trial.[9] Indeed, the relief that Mother seeks on appeal—

---

[9]To the extent that Mother complains that the former trial judge's sua sponte finding of aggravated circumstances limited her ability to engage in services, we note

that we reverse the termination order and remand the case back to the trial court—seems redundant when the case was already transferred away from the former trial judge and where a trial before a different judge has already taken place.

To support her argument, Mother points us to *L.S.*, a termination case involving the former trial judge, where we held that the former trial judge's conduct in that case demonstrated a "deep-seated antagonism" against one of the parents that deprived the parent of "a fair trial before an impartial fact-finder and resulted in fundamental and harmful error." 2017 WL 4172584, at *21. In *L.S.*, we detailed numerous instances where the former trial judge demonstrated his bias against the parent, and we noted that the final termination hearing was a bench trial before the former trial judge. *Id.* at *5–13. We ultimately held that "[b]ased on the exceptional and singular facts that are clearly shown in the record here, . . . [the former trial judge] ceased to be a neutral and unbiased fact-finder . . . which probably resulted in the rendition of an improper judgment . . . ." *Id.* at *1. We thus reversed the order of termination and remanded the case for a new trial before a different trial judge. *Id.* at *21.

that complaints regarding a trial court's finding of aggravated circumstances made in a temporary order are moot after rendition of a final termination order. *See In re A.K.*, 487 S.W.3d 679, 683–84 (Tex. App.—San Antonio 2016, no pet.) (holding that father's complaints about aggravated-circumstances findings in temporary orders were mooted by final termination order); *M.Z. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-13-00858-CV, 2014 WL 2191978, at *6 n.8 (Tex. App.—Austin May 22, 2014, no pet.) (mem. op.) (holding that mother's complaint about aggravated-circumstances finding in temporary order was mooted by final termination order).

Even though *L.S.* involved the same trial judge as the one at issue here, *L.S.* is easily distinguishable. In *L.S.*, the Department's termination petition was tried in a bench trial before the former trial judge. *Id.* at \*7 n.11. Here, in contrast, the Department's termination petition was tried before a jury presided over by the trial judge for the 393rd District Court. Thus, while in *L.S.* we held that the former trial judge's actions and comments "probably resulted in the rendition of an improper judgment," we cannot say the same here. *Id.* at \*21. Accordingly, Mother has not preserved the complaints she makes on appeal. *See* Tex. R. App. P. 33.1(a)(1)(A); *Dow Chem.*, 46 S.W.3d at 241; *Bushell*, 803 S.W.2d at 712; *L.S.*, 2017 WL 4172584, at \*16. We overrule Mother's sole issue.

## IV. CONCLUSION

Having overruled Mother's sole issue, we affirm the termination order.

/s/ Dana Womack

Dana Womack
Justice

Delivered: January 27, 2022

17