

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-24-00067-CV

———————————————

In the Interest of N.T. and K.C., Children

---

On Appeal from the 158th District Court
Denton County, Texas
Trial Court No. 22-9549-158

---

Before Sudderth, C.J.; Bassel and Womack, JJ.
Memorandum Opinion by Chief Justice Sudderth

# MEMORANDUM OPINION

Appellant N.L.T. (Mother) challenges the termination of her parental rights to two of her sons, N.J.T. (Nick) and K.D.C. (Kyle) (collectively, the Children).[1] Mother raises ten appellate issues, arguing that the evidence was insufficient to support any of the eight predicate termination grounds found by the jury; that the evidence was similarly insufficient to support the jury's findings that termination was in the Children's best interest; and that, because there was allegedly insufficient evidence to support the trial court's pretrial finding of aggravated circumstances, the Department's reliance on that finding resulted in "fundamentally [un]fair procedures." We will affirm.

## I. Background[2]

Mother's parental rights were terminated in January 2024, but the Department of Family and Protective Services became involved approximately six years earlier.

Kyle was born in 2017, and at the time of his birth, both he and Mother tested positive for marijuana. Mother later denied that she had used drugs and denied that the tests had been positive. The Department intervened, though, and it implemented

---

[1]Mother has two other sons—one older than Nick and Kyle and one younger than Nick and Kyle—but they are not part of this case, and at trial, Mother testified that her two other sons lived in Georgia with other individuals.

[2]The factual summary views the evidence in light of the jury's termination findings, while also including disputed evidence that a reasonable jury could not have resolved in favor of the finding. *See In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018) (discussing appellate court's consideration of the facts in review of factual sufficiency).

a Department "safety plan" that was intended to protect not only Kyle but also the other child in Mother's custody: her then-three-year-old son, Nick. The safety plan prohibited Mother from, among other things, having unsupervised contact with the Children or leaving the county with them.

Nonetheless, Mother took the Children and moved to Georgia. The Department did not learn of their location until 2018 when a car wreck in Georgia sent Mother and the Children to the hospital. Upon testing, both Mother and Kyle tested positive for cocaine and marijuana. Again, Mother dismissed the drug tests as untrue and insisted that neither she nor Kyle had been exposed to drugs. But as the Department began taking steps to remove the Children from Mother's care, she fled with them again.

Ultimately, when Mother was located later in 2018, she was arrested[3] and the Children were removed and placed in a foster home with Foster Mother and Foster Father (collectively, Foster Parents). When the Children were drug-tested, they tested positive for marijuana, cocaine, and cocaine metabolites, with the metabolites indicating—as a Department investigator later explained—that the Children had actually ingested the cocaine.

---

[3]Mother was arrested multiple times while the case was pending. But the Department did not present evidence of any criminal convictions, and Mother testified that she had not been convicted of any felonies.

The trial court then entered an order requiring Mother to complete a Department-created service plan as a condition for reunification with the Children, but Mother failed to complete the service plan. Although one of Mother's caseworkers remembered her "temporarily engag[ing] in services" for short periods of time, Mother consistently refused to give the Department a verifiable home address, she failed to verify her employment, she denied that she had ever used drugs, and she routinely yelled and cursed at the Department's representatives on the phone.[4] When the Department would schedule Mother for drug-testing—a condition of her service plan—she often failed to attend or declined to provide a hair strand for testing. And when she did submit to drug testing, she periodically tested positive for marijuana. On one occasion, Mother offered a sample that the testing facility refused to take due to signs of tampering.

Mother's visitations with the Children were similarly bumpy. Although Mother attended many of her initial visitations, those visitations were curtailed after several disruptive incidents, including Mother's getting into a fight with Kyle's father in front of the Children and "banging on his car windows and screaming profanity." Then, after the visitations were modified to biweekly virtual sessions, Mother's attendance became inconsistent. When she did attend these sessions, Mother continued her disruptive behavior. On one occasion, Foster Mother recalled Mother yelling at Nick

---

[4]Mother was incarcerated for several months after the Children's removal, so we focus on her actions or omissions upon her release.

to bring Kyle back on the screen. On another occasion, Mother "scream[ed] profanity" at Foster Mother in the Children's presence. And on another, she yelled at the Department observer to bring the Children back to the screen when they took a bathroom break.

Ultimately, the Department sought to terminate Mother's parental rights. *See In re K.C.*, 656 S.W.3d 146, 147–49 (Tex. App.—Fort Worth 2022, no pet.). An order terminating her parental rights was signed in 2022, but when that order was vacated on appeal due to jurisdictional issues, *see id.* at 147–53,[5] the Department reached back out to Mother in an effort to reunite her with the Children. But in response, Mother "yell[ed]" and "curs[ed]" at the Department representative, she "refused to tell [them] anything," and she claimed that she was in Georgia. So the Department initiated a new termination case—the present one.

Although the trial court found that "aggravated circumstances" existed such that the Department was not required to provide Mother with another service plan, *see* Tex. Fam. Code Ann. § 262.2015(a), the Department nonetheless offered Mother services and asked her to complete drug tests. Once again, however, Mother did not complete the provided services and repeatedly failed to submit to drug tests, even when such tests were ordered by the trial court.

---

[5]In *K.C.*, we held that the termination case had been automatically dismissed under Family Code Section 263.401(c). 656 S.W.3d at 149–53; *see* Tex. Fam. Code Ann. § 263.401.

By the time of trial, the Children had been living with Foster Parents for more than five years and Mother had not visited with them in more than two. A jury found that terminating Mother's parental rights to the Children was in the Children's best interest, and it further found that Mother had violated eight separate predicate grounds for termination, including that she had "engaged in conduct or knowingly placed [the Children] with persons who [had] engaged in conduct which endanger[ed] the[ir] physical or emotional well-being."[6] *Id.* § 161.001(b)(1)(E).

## II. Discussion

Mother raises ten appellate issues, but we need only review three: two related to the jury's findings in support of termination, and one related to the trial court's pretrial finding of aggravated circumstances.

---

[6]In the seven other predicate grounds found by the jury for each of the Children, it concluded that Mother had (1) "voluntarily left [the Children] alone or in the possession of another not the parent and expressed an intent not to return"; (2) "voluntarily left [the Children] alone or in the possession of another without providing adequate support of the children and remained away for a period of at least six months"; (3) "knowingly placed or knowingly allowed . . . [the Children] to remain in conditions or surroundings which endangered [their] physical or emotional well-being"; (4) "failed to support [the Children] in accordance with [her] ability during a period of one year ending within six months of the date of the filing of the petition"; (5) "failed to comply with the provisions of a court order that specifically established the actions necessary for [her] to obtain the return of [the Children]"; (6) "constructively abandoned [the Children]"; and (7) "used a controlled substance in a manner that endangered the health or safety of [the Children]." *See* Tex. Fam. Code Ann. § 161.001(b)(1)(A), (C), (D), (F), (N), (O), (P).

## A. Jury's Termination Findings

To terminate a parent–child relationship, the Department must prove two elements by clear and convincing evidence:[7] (1) that the parent's actions satisfy at least one statutory predicate ground in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. *Id.* §§ 161.001(b)(1), (2), 161.206(a), (a–1); *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019). Mother challenges (1) the legal and factual sufficiency of the evidence to support the jury's eight predicate findings for each of the Children, and (2) the legal and factual sufficiency of the evidence to support the jury's findings that termination was in the Children's best interest.[8]

---

[7]Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

[8]Mother's unsuccessful motion for new trial preserved her factual sufficiency complaints. *See In re J.S.*, No. 02-18-00164-CV, 2018 WL 5833438, at *2 (Tex. App.—Fort Worth Nov. 8, 2018, pet. denied) (per curiam) (mem. op.) ("A complaint that the evidence is factually insufficient to support a jury answer, or that the answer is against the overwhelming weight of the evidence, must have been raised in a motion for new trial."). But Mother did not preserve her legal sufficiency complaints—she did not raise such complaints in her motion for new trial; she did not object to the jury charge; and she did not move for a directed verdict, for a judgment notwithstanding the verdict, or to disregard any of the jury's answers. *See id.* (explaining that, "[i]n a jury trial, a no-evidence complaint is preserved through one of the following: (1) a motion for instructed verdict; (2) a motion for judgment notwithstanding the verdict; (3) an objection to the submission of the issue to the jury; (4) a motion to disregard the jury's answer to a vital fact issue; or (5) a motion for new trial."); *see also In re S.J.*, No. 05-22-01210-CV, 2023 WL 2726710, at *1 (Tex. App.—Dallas Mar. 31, 2023, no pet.) (similar).

Nonetheless, because resolution of Mother's unpreserved legal sufficiency complaint is encompassed within our analysis of her preserved factual sufficiency

### 1. Standard of Review

When reviewing the sufficiency of clear-and-convincing termination findings, we ask whether a reasonable jury could have formed a firm belief or conviction that the challenged findings were true. *A.C.*, 560 S.W.3d at 630–31. Both legal and factual sufficiency turn on this question; the distinction between the two "lies in the extent to which disputed evidence contrary to a finding may be considered" in answering the question. *Id.* at 630.

For legal sufficiency, we view the evidence in a light most favorable to the findings, *In re R.R.A.*, No. 22-0978, 2024 WL 1221674, at *5 (Tex. Mar. 22, 2024); *A.C.*, 560 S.W.3d at 630–31, but for factual sufficiency, we consider the disputed evidence that a reasonable jury could not have credited in favor of a finding and weigh its significance in light of the entire record. *A.C.*, 560 S.W.3d at 631; *see In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) ("When the factual sufficiency of the evidence is challenged, only then is disputed or conflicting evidence under review."). If the evidence is factually sufficient, it is necessarily legally sufficient. *A.N.*, 2022 WL 2071966, at *2. But neither sufficiency analysis allows us to supplant the jury's judgment with our own; the jury remains the sole arbiter of the credibility and demeanor of witnesses. *R.R.A.*, 2024 WL 1221674, at *5.

---

complaint, and in the interest of judicial economy, we will apply both standards. *See In re A.N.*, No. 02-22-00036-CV, 2022 WL 2071966, at *2 (Tex. App.—Fort Worth June 9, 2022, pet. denied) (mem. op.) (noting that "if the evidence is factually sufficient, it is necessarily legally sufficient").

### 2.   Statutory Predicate Grounds

Mother challenges the legal and factual sufficiency of all eight predicate termination grounds found by the jury.  "To affirm a termination judgment on appeal, [though,] a court need uphold only one [predicate] termination ground," along with the best-interest finding.  *N.G.*, 577 S.W.3d at 232; *In re H.C.*, No. 02-23-00477-CV, 2024 WL 1561513, at *4 (Tex. App.—Fort Worth Apr. 11, 2024, no pet. h.) (mem. op.).  Thus, we need only address one predicate ground:  the jury's Subsection (E) predicate findings that Mother's course of conduct endangered the Children.[9]  *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E).

### a.   Applicable Law:  Conduct-Based Endangerment

A parent's rights may be terminated under Subsection (E) of Family Code Section 161.001(b)(1) if the jury finds that the parent "engaged in conduct or knowingly placed the child[ren] with persons who engaged in conduct which endanger[ed] the physical or emotional well-being of the child[ren]."[10]  *Id.*  Such a finding of endangerment requires a "voluntary, deliberate, and conscious course of

---

[9]Because a jury's finding of environment-based or conduct-based endangerment "can serve as predicate grounds for terminating Mother's parental rights to other children, *see* [Tex. Fam. Code Ann.] § 161.001(b)(1)(M), . . . we must address at least one of the two challenged endangerment findings, even [if] the findings may not be dispositive." *Id.*

[10]To "'[e]ndanger' means to expose to loss or injury; to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *H.C.*, 2024 WL 1561513, at *5.

conduct" rather than "a single act or omission." *H.C.*, 2024 WL 1561513, at *5 (quoting *A.N.*, 2022 WL 2071966, at *3). And because it requires a course of conduct, evidence of conduct-based endangerment "is not limited to actions directed towards the child[ren]," nor is it limited to the parent's pre-removal actions. *J.O.A.*, 283 S.W.3d at 345; *A.N.*, 2022 WL 2071966, at *3. Instead, the jury may consider actions before the children's birth and actions while the children are in the Department's custody. *H.C.*, 2024 WL 1561513, at *5; *A.N.*, 2022 WL 2071966, at *3; *In re E.C.*, No. 02-20-00022-CV, 2020 WL 2071755, at *6 (Tex. App.—Fort Worth Apr. 30, 2020, no pet.) (mem. op.); *see J.O.A.*, 283 S.W.3d at 345–46.

Endangering conduct may include, for example, a pattern of drug use, a pattern of volatile behavior, or a failure to consistently visit the children. *See In re E.T.*, No. 02-22-00299-CV, 2022 WL 17172492, at *4–6 (Tex. App.—Fort Worth Nov. 23, 2022, no pet.) (mem. op.); *A.N.*, 2022 WL 2071966, at *3–5. Drug use can be endangering because it can impair or incapacitate the user's ability to parent, *A.N.*, 2022 WL 2071966, at *4, and a parent's drug use is particularly concerning if it occurs by a mother while she is pregnant, if the parent refuses to acknowledge or address the drug habit, or if the parent decides to continue using drugs even when the parent–child relationship is in jeopardy. *See H.C.*, 2024 WL 1561513, at *5–6; *In re A.K.*, No. 02-22-00154-CV, 2022 WL 4545571, at *5 (Tex. App.—Fort Worth Sept. 29, 2022, pet. denied) (mem. op.); *A.N.*, 2022 WL 2071966, at *3–4. Similarly, a pattern of violent or volatile behavior—whether attributable to drug use or to something else—

10

can pose a risk of physical and emotional danger to a child. *See In re B.W.*, No. 02-19-00009-CV, 2019 WL 2415324, at *1 (Tex. App.—Fort Worth June 6, 2019, no pet.) (supp. mem. op.) ("Domestic violence, want of self[-]control, and propensity for violence may be considered as evidence of endangerment." (quoting *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.)); *E.T.*, 2022 WL 17172492, at *4 ("Violent or abusive conduct directed at the other parent or other people, even if it is not committed in the child's presence, may . . . be sufficient to show a[n endangering] course of conduct under [S]ection 161.001(b)(1)(E)." (quoting *In re A.S.*, No. 02-16-00076-CV, 2016 WL 3364838, at *7 (Tex. App.—Fort Worth June 16, 2016, no pet.) (mem. op.))). And inconsistent visitation is another behavior that "'can be very damaging' to a child" and "can emotionally endanger [the] child's well-being.'" *A.N.*, 2022 WL 2071966, at *5 (first quoting *In re S.I.H.*, No. 02-11-00489-CV, 2012 WL 858643, at *6 (Tex. App.—Fort Worth Mar. 15, 2012, no pet.) (mem. op.); and then quoting *D. L. G. v. Tex. Dep't of Fam. & Protective Servs.*, Nos. 03-20-00314-CV, 03-20-00315-CV, 2020 WL 6789208, at *5 (Tex. App.—Austin Nov. 19, 2020, no pet.) (mem. op.)).

### b. Mother's Endangering Course of Conduct

Here, there was ample evidence that Mother's course of conduct—particularly her ongoing drug use, her failure to acknowledge her drug habit, her pattern of volatile behavior, and her inconsistent visitation—endangered the Children:

11

- A Department investigator testified that Mother and Kyle had tested positive for marijuana at the time of Kyle's birth, showing that Mother had used marijuana while she was pregnant with Kyle and had exposed Kyle to the drug. *See A.N.*, 2022 WL 2071966, at *4 (recognizing that mother's "drug use while pregnant endangered [the children] because [they] w[ere] exposed to the possibility of being born with adverse medical conditions").

- A Department investigator testified (and drug tests admitted into evidence confirmed) that the Children had tested positive for marijuana and cocaine at the time of their removal in late 2018, indicating that Mother had exposed Children to drugs. *See In re S.V.*, No. 02-23-00188-CV, 2023 WL 5967890, at *9 (Tex. App.—Fort Worth Sept. 14, 2023, no pet.) (mem. op.) (affirming conduct-based endangerment finding based in part on evidence that "both drugs and drug users were finding their way into the children's home").

- Mother's caseworkers described her refusal to submit to many of the drug tests requested of her, and the jury could infer that she was avoiding testing because the tests would have been positive.[11] *See H.C.*, 2024 WL 1561513, at *6 (applying rule that "[a] factfinder may reasonably infer that a parent's failure to comply with drug-test requirements indicates drug use"); *A.N.*, 2022 WL 2071966, at *4 (noting that Mother's refusal to submit to drug test allowed trial court to infer that she was avoiding testing because she was using drugs).

- Mother's caseworkers also described how, when Mother did submit to drug testing, she periodically tested positive for marijuana, and on one occasion, she offered a urine sample that exhibited signs of tampering.

---

[11]In a footnote, Mother argues that her behavior after the Children's removal was irrelevant, though she does not explain why. Based on the authority cited in related portions of her brief, though, Mother's assertion of irrelevance appears to stem from her confusing conduct-based endangerment with another statutory predicate ground: environment-based endangerment. While the relevant timeframe for determining environment-based endangerment is prior to removal, *see In re J.W.*, 645 S.W.3d 726, 749 (Tex. 2022), the relevant timeframe for determining conduct-based endangerment is not as limited. For conduct-based endangerment, "[t]he endangering conduct does not have to occur in the child[ren]'s presence" and "may occur . . . either before or after the child[ren]'s removal by the Department." *E.C.*, 2020 WL 2071755, at *6.

12

- Mother continually denied that she had used drugs or needed treatment, despite the positive drug-test results, and she failed to complete the drug-treatment programs provided to her. *See H.C.*, 2024 WL 1561513, at *6 (noting that parents' "refusal to acknowledge and address their addiction, even when faced with the prospect of losing their daughter" supported Subsection (E) endangerment finding); *A.N.*, 2022 WL 2071966, at *5 (noting that mother's failure to complete court-ordered services, including "drug treatment programs that could have helped address her habit," supported conduct-based endangerment finding).

- Numerous witnesses—including Department investigators, caseworkers, and a CASA representative—described Mother as "very aggressive," "hostile," "combative," and "belligerent," noting her tendency to yell and curse at them. *See S.V.*, 2023 WL 5967890, at *9 (affirming conduct-based endangerment finding based in part on evidence that the father "could become angry and act violently"). Foster Mother confirmed that Mother had exhibited this behavior in front of the Children as well, recalling Mother having engaged in an explosive fight with Kyle's father after a visitation session and having cursed at Foster Mother in front of the Children during virtual visitations.

- Although Mother testified that she had "[n]ever" missed any scheduled visits until mid-2021, Foster Mother remembered that, about half of the time, Mother did not attend the virtual visitations scheduled with the Children. And by the time of trial, Mother had not visited with the Children in more than two years. *A.N.*, 2022 WL 2071966, at *5 (recognizing that "[a] parent's inconsistent visitation can be very damaging to a child, and can emotionally endanger a child's well-being, supporting termination under [S]ubsection (E)" (internal quotation marks omitted)).

Mother does not appear to dispute that this evidence—assuming it was relevant—supported the jury's findings of conduct-based endangerment under Subsection (E). But she implicitly argues that this evidence was irrelevant by

13

emphasizing that much of the behavior occurred years before the current termination case and was "far too remote" in time to be considered.[12]

Mother's "remoteness" argument is off point. While the length of time that has passed since a parent's questionable actions is a factor for the jury to consider, it does not necessarily render evidence irrelevant.[13] *Cf. J.O.A.*, 283 S.W.3d at 346–47 (noting that intermediate court's analysis "suggest[ed] a comparison of [the father's] conduct over time, attributing greater weight to his recent improvements and less to his past challenges" and noting that such weighing was permissible in a factual

---

[12]Mother repeats this argument throughout her appellate issues and claims that the "remoteness issue . . . is fatal to the State's case" in general. In another section of her brief, she goes on to assert that the "remoteness issue" rendered the evidence insufficient to support the Children's removal in 2022 and thus, she claims, makes the case "void ab initio." [Capitalization altered and internal quotation marks omitted.] Putting aside Mother's failure to cite supporting caselaw for her assertion of voidness and her failure to list such assertion as a separate issue, *cf.* Tex. R. App. P. 38.1(f), (i), her complaint is nonetheless moot because "[a] temporary order is superseded by the entry of a final order of termination, rendering moot any complaint about the temporary order." *In re K.E.*, No. 02-20-00045-CV, 2020 WL 4360493, at *3 (Tex. App.—Fort Worth July 30, 2020, pet. denied) (mem. op.) (holding that mother's due-process complaints regarding temporary order were moot); *In re J.F.G., III*, 500 S.W.3d 554, 558–59 (Tex. App.—Texarkana 2016, no pet.) (holding that mother's complaints regarding the sufficiency of the evidence to support the initial removal were moot); *see In re Z.R.M.*, No. 04-15-00063-CV, 2015 WL 4116049, at *5 n.5 (Tex. App.—San Antonio July 8, 2015, no pet.) (mem. op.) (noting that complaints regarding removal were not proper in appeal from final termination order).

[13]Mother cites *Hendricks v. Curry* for the alleged rule that the statutory predicate grounds for termination "do not contemplate that an adjudication may be based solely upon conditions which existed in the distant past but no longer exist." *Hendricks v. Curry*, 401 S.W.2d 796, 800 (Tex. 1966). But the quoted statement from *Hendricks* was discussing the relevant timeframe for determining whether a child met the statutory definition of a dependent or neglected child under the provision then in effect. *See id.*

14

sufficiency analysis but not in a legal sufficiency analysis). And here, a reasonable jury could have concluded that the evidence of Mother's years-old actions did not reflect "remote" abandoned behaviors but instead reflected a longstanding course of conduct.

Although Mother's use of marijuana while pregnant, her use of marijuana and cocaine while the Children were in her care, and her exposing the Children to marijuana and cocaine all occurred approximately six years before the termination trial, there was evidence that Mother had continued to engage in the same pattern of behavior while the case was pending—she had tested positive for marijuana on multiple occasions, and given that she consistently refused drug tests, the jury could infer that she was continuing to use drugs. *See H.C.*, 2024 WL 1561513, at *6; *A.N.*, 2022 WL 2071966, at *4. Even at trial, when Mother was asked if she would be willing to take a drug test that day, she said no. The evidence of Mother's allegedly "remote" drug-related conduct thus continued to bear on the present, and its prolonged duration bolstered rather than undermined the jury's endangerment findings.[14] *See In re J.S.*, No. 14-22-00723-CV, 2023 WL 2486832, at *11 (Tex. App.— Houston [14th Dist.] Mar. 14, 2023, no pet.) (mem. op.) (noting that, when there is evidence of "conditions that existed in the distant past but no longer exist, the

---

[14]Even if there had been evidence that Mother had reformed her behavior, "evidence of improved conduct, especially of short[ ]duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices." *J.O.A.*, 283 S.W.3d at 346.

15

dispositive inquiry is whether the past continues to bear on the present"); *In re M.R.D.*, No. 04-19-00524-CV, 2020 WL 806656, at *10 (Tex. App.—San Antonio Feb. 19, 2020, pet. denied) (mem. op.) (similar).

In sum, whether viewing the evidence in a light most favorable to the verdict or considering the disputed evidence based on the record as a whole, a reasonable jury could have formed a firm belief or conviction that Mother had engaged in an endangering course of conduct both while the Children were in her care and afterward. The jury's statutory predicate findings of endangering conduct were thus supported by legally and factually sufficient evidence. *See A.C.*, 560 S.W.3d at 630–31.

We overrule Mother's issue challenging the conduct-based predicate grounds, and because only one predicate ground is necessary to affirm termination, we need not address Mother's challenges to the other seven predicate findings. *See* Tex. R. App. P. 47.1; *H.C.*, 2024 WL 1561513, at *4.

### 3. Best Interest

Mother next challenges the legal and factual sufficiency of the jury's findings that termination was in the Children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2).

#### a. Applicable Law: Best Interest

Although we presume that the best interest of a child is served by keeping the child with a parent, *see In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest inquiry "is child-centered, focusing on the child's well-being, safety, and

16

development," *H.C.*, 2024 WL 1561513, at *8. We consider several factors, including (1) the desires of the child; (2) the emotional and physical danger to the child; (3) the emotional and physical needs of the child; (4) the stability of the home or proposed placement; (5) the plans for the child by those seeking custody; (6) the parental abilities of those seeking custody; (7) the programs available to assist those seeking custody; (8) the acts or omissions of the parent indicating that the parent–child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see H.C.*, 2024 WL 1561513, at *8–9. These factors are neither exhaustive nor exclusive, and not all factors apply in all cases. *H.C.*, 2024 WL 1561513, at *9; *A.K.*, 2022 WL 4545571, at *3.

### b. The Children's Best Interest

As with Mother's challenge to the jury's findings of conduct-based endangerment, her best-interest challenge goes to the temporal relevance of the evidence rather than to its substance. She argues that the Department "did not show that the [C]hildren's current best interest is impacted by events alleged to have occurred several years earlier" and that the "time gap is too large to support a finding that termination is in the current best interest of these [C]hildren." But as we have already held, the "time gap" did not render Mother's actions irrelevant, and there was evidence that her conduct from several years earlier was part of a pattern of behavior that continued up until the time of trial. *See supra* Section II.A.2.b.

17

And the evidence of Mother's pattern of behavior was supplemented by other evidence that termination was in the Children's best interest:

- Although the Children were very young at the time of trial—Nick was 9 and Kyle was 6—a CASA advocate testified that they had expressed a desire to be adopted by Foster Parents, and Foster Mother testified that they referred to Mother as "visit lady." *See Holley*, 544 S.W.2d at 371–72 (listing "the desires of the child" as a best-interest consideration).

- Regarding the Children's physical safety, a Department investigator testified that Mother had used marijuana while pregnant with Kyle, and Foster Mother described some of the ongoing medical effects of Kyle's having been exposed to drugs in utero, including chronic constipation and wetting the bed. *See id.* (listing the "physical danger to the child now and in the future" as a best-interest consideration).

- A Department investigator testified that the Children had tested positive for cocaine and marijuana when they were removed from Mother's care, and drug tests admitted into evidence confirmed that they had been exposed to drugs. *See id.*

- As discussed above, Mother's pattern of drug use, her refusal to submit to drug testing—presumably because she would have tested positive—and her refusal to acknowledge her drug habit posed a danger to the Children's well-being if they were returned to her care. *See In re L.T.*, No. 02-22-00197-CV, 2022 WL 15053329, at *7 (Tex. App.—Fort Worth Oct. 27, 2022, no pet.) (mem. op.) (considering mother's pattern of drug use and refusal to submit to drug tests as evidence supporting best-interest finding); *see also Holley*, 544 S.W.2d at 371–72 (listing the "physical danger to the child now and in the future" and "the programs available to assist" the parent as best-interest considerations).

- Regarding the Children's emotional needs, the testimony showed that Foster Parents had regularly taken the Children to therapy and that both Nick and Kyle had been successfully discharged from therapy by the time of trial. *See Holley*, 544 S.W.2d at 371–72 (listing "the emotional and physical needs of the child now and in the future" and "the programs available to assist" those seeking custody as best-interest considerations).

- According to one of Mother's caseworkers and a CASA representative, Mother rarely asked how the Children were doing and showed little concern for their

18

emotional well-being. Mother's caseworker at the time of trial testified that, in all the times he had spoken with Mother, she had only asked how the Children were doing "[m]aybe one time." *See id.*

- As for the Children's physical needs, Nick had decaying teeth when he was removed from Mother's care, and when Mother was asked why she did not take him to the dentist, she denied that he had any issues and called his tooth decay a lie. *See id.* (listing the "physical needs of the child now and in the future" as a best-interest consideration).

- Mother acknowledged that, even though the Children had been removed almost six years earlier, she had only begun paying child support a month before trial. *See id.*

- Mother's employment was unclear. Two of Mother's caseworkers testified that she had refused to verify her employment or clarify how she was supporting herself. And although Mother testified that she had worked for a home healthcare provider on and off for five years making $1,200 per month, other evidence called this testimony into question—including Mother's acknowledgement that her employer had only begun withholding child-support payments a month before trial, her insistence that she primarily lived in Georgia, and her testimony that she had worked "about four" jobs since 2017. *See id.* (listing the "physical needs of the child" and "the stability of the home" as best-interest considerations); *H.C.*, 2024 WL 1561513, at *11 (noting that stability of the home weighed in favor of finding that termination was in child's best interest when neither parent provided proof of employment).

- The location and existence of Mother's residence was also unclear. *See Holley*, 544 S.W.2d at 371–72 (listing "the stability of the home" as best-interest consideration). Multiple caseworkers testified that Mother had refused to give the Department a verifiable home address or to allow the Department to visit her home. And while Mother initially testified that she did not live in Texas and only "stay[ed]" with family when she was in the State, she later testified that she worked in Texas and only returned to Georgia "[e]very other month."

- Multiple individuals testified that Nick and Kyle were "thriving" in their foster home and that they were very bonded to Foster Parents. They called Foster Mother "mom" and had been in the same foster home since their removal six years earlier. Foster Mother testified that she and her husband wanted to adopt the Children, and a CASA representative testified that the Children "very much s[aw] the foster parents as their parents" *See id.* (listing "the [Department's]

19

plans for the child" and "the stability of the home or proposed placement" as best-interest considerations).

• As already noted, numerous witnesses described Mother as "very aggressive," "hostile," "combative," and "belligerent." But Mother stated that all of the witnesses had lied, and she denied ever having yelled or cursed at any Department representatives. *See id.* (listing "the stability of the home" and "the parental abilities" of the parent as best-interest considerations).

• Although Mother testified that she had completed a parenting class, she also stated that she "already knew everything about being a parent[, s]o it was real easy." *See id.* (listing "the parental abilities" of the parent as best-interest consideration).

• Mother's caseworkers testified that she had failed to take advantage of many of the programs offered to assist her, including drug-treatment programs. Her caseworker at the time of trial testified that he "ha[d] not seen any progress." *See id.* (listing "the programs available to assist" the parent as best-interest consideration).

• Mother had multiple positive and presumed-positive drug tests while her Children were in the Department's custody, "reflect[ing] a dysfunctional parent–child relationship because Mother could not or would not maintain the sobriety necessary to provide for her Children's physical and emotional needs," even when her parental rights were in jeopardy. *L.T.*, 2022 WL 15053329, at *8; *see Holley*, 544 S.W.2d at 371–72 (listing "the acts or omissions of the parent which may indicate that the existing parent–child relationship is not a proper one" as best-interest consideration).

• Mother's inconsistent visitation also reflected a dysfunctional parent–child relationship. *See Holley*, 544 S.W.2d at 371–72. As previously discussed, by the time of trial, Mother had not visited with the Children in more than two years.

• On cross-examination, Mother testified that she would do anything to get Nick and Kyle back—but only if it was done her way. *See id.*

• Finally, Mother made excuses for her actions rather than taking responsibility. *See id.* (listing "any excuse for the acts or omissions of the parent" as a best-interest consideration). Mother did not acknowledge her drug use and testified that she had "[n]ever [even] smoked a cigarette[—n]ever." When asked about

20

the Children's positive drug tests, Mother denied that the tests had been accurate, calling such alleged test results "lies."

Based on this evidence—whether viewing it in a light most favorable to the verdict or weighing the disputed evidence based on the record as a whole—a reasonable jury could have formed a firm belief or conviction that termination was in the Children's best interest. The evidence was therefore legally and factually sufficient to support the jury's best-interest findings. *See A.C.*, 560 S.W.3d at 630–31.

We overrule this issue.

## B.     Pretrial Finding

In her final issue, Mother contends that there was insufficient evidence to support the trial court's pretrial finding of aggravated circumstances, and that absent such a finding—which waived certain statutory requirements, *see* Tex. Fam. Code Ann. § 262.2015(a)—the Department "did not use fundamentally fair procedures in its handling of this case."

Even if we assume that Mother adequately briefed this issue,[15] the finding of aggravated circumstances was made in a temporary order, and "complaints regarding a

---

[15]Mother claims that there were only two pieces of evidence offered to support the trial court's pretrial finding of aggravated circumstances and that neither piece of evidence was valid. But Mother has not cited anything in the record to support her contention that the aggravated-circumstances finding was based solely on the two pieces of evidence she discusses. In fact, her analysis of the issue does not include any record citations—to the aggravated-circumstances finding, to the aggravated-circumstances hearing, or otherwise. *Cf.* Tex. R. App. P. 38.1(i) (requiring argument portion of appellant's brief to include "appropriate citations to authorities and to the record").

trial court's finding of aggravated circumstances made in a temporary order are moot after rendition of a final termination order." *In re B.A.*, No. 02-21-00278-CV, 2022 WL 247558, at *7 n.9 (Tex. App.—Fort Worth Jan. 27, 2022, pet. denied) (mem. op.); *see K.E.*, 2020 WL 4360493, at *2–3 (holding in termination case that "[m]other's complaints about any temporary orders [we]re rendered moot by the final order"); *J.F.G.*, 500 S.W.3d at 558–59 (holding that mother's complaints regarding the sufficiency of the evidence to support pretrial finding of aggravated circumstances were moot); *In re A.K.*, 487 S.W.3d 679, 683–84 (Tex. App.—San Antonio 2016, no pet.) (rejecting challenge to aggravated-circumstances finding as moot because "a temporary order is superseded by entry of a final order of termination, rendering moot any complaint about the temporary order"); *M.Z. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-13-00858-CV, 2014 WL 2191978, at *6 n.8 (Tex. App.—Austin May 22, 2014, no pet.) (mem. op.) (noting that, although mother complained of lack of services provided to her as a result of aggravated-circumstances finding, "the temporary orders [we]re moot and not subject to review on appeal" because a final order of termination had been entered); *In re D.W.*, Nos. 01-13-00880-CV, 01-13-00883-CV, 01-13-00884-CV, 2014 WL 1494290, at *3 (Tex. App.—Houston [1st Dist.] Apr. 11, 2014, no pet.) (mem. op.) (holding that challenge to sufficiency of the evidence to support temporary order was moot "[b]ecause a final decree ha[d] been entered in each of the children's cases").

We overrule Mother's tenth and final issue.

### III.  Conclusion

Having overruled Mother's dispositive issues, we affirm the trial court's judgment terminating the parent–child relationship between Mother and the Children, Nick and Kyle.  Tex. R. App. P. 43.2(a).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered:  May 9, 2024